```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      TEXARKANA DIVISION

 4   COLTON CARICO,              )(

 5        PLAINTIFF,             )(    CIVIL ACTION NO.

 6                               )(    5:22-CV-95-RWS

 7   VS.                         )(    TEXARKANA, TEXAS

 8                               )(

 9   DEREK BRISTOW,              )(    DECEMBER 13, 2023

10        DEFENDANT.             )(    2:00 P.M.

11            MOTION FOR SUMMARY JUDGMENT HEARING

12        BEFORE THE HONORABLE ROBERT W. SCHROEDER III

13               UNITED STATES DISTRICT JUDGE

14   FOR THE PLAINTIFF:      Mr. Mark V. Maguire
                             McEldrew Young Purtell Merritt
15                           123 S. Broad Street, Suite 2250
                             Philadelphia, PA 19109
16
     FOR THE DEFENDANT:      Mr. Darrell G-M Noga
17                           Fee, Smith, Sharp, & Vitullo LLP
                             Three Galleria Tower
18                           13155 Noel Road, Suite 1000
                             Dallas, TX 75240
19
     COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
20                           Official Court Reporter
                             Honorable Robert W. Schroeder III
21                           United States District Judge
                             Eastern District of Texas
22                           Texarkana Division
                             500 North State Line Avenue
23                           Texarkana, TX 75501
                             shelly_holmes@txed.uscourts.gov
24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

02:00:54    1          COURT SECURITY OFFICER:  All rise.

02:00:55    2          THE COURT:  Please be seated.

02:00:57    3          Mrs. Schroeder, if you would, call the case for

02:01:00    4    us.

02:01:00    5          COURTROOM DEPUTY:  Case No. 5:22-CV-95, Colton

02:01:06    6    Carico versus Derek Bristow.

02:01:08    7          THE COURT:  Announcements for the record?

02:01:09    8          MR. MAGUIRE:  Good afternoon, Your Honor.  Mark

02:01:11    9    Maguire on behalf of Colton Carico.

02:01:13   10          THE COURT:  Good afternoon, Mr. Maguire.

02:01:15   11          MR. NOGA:  Good afternoon, Your Honor.  Darrell

02:01:17   12    Noga on behalf of Defendant Officer Bristow.

02:01:19   13          THE COURT:  Good afternoon.

02:01:20   14          MR. KLEMENT:  Your Honor, Christopher A. Klement,

02:01:25   15    also for Defendant Officer Bristow.

02:01:27   16          THE COURT:  Hello.

02:01:28   17          Welcome to everybody.  Thank you all for being

02:01:30   18    here today.

02:01:31   19          We have set for argument this afternoon the

02:01:35   20    Defendant's motion for summary judgment regarding a

02:01:39   21    qualified immunity.  The motion has been briefed through a

02:01:44   22    reply.  There were attachments to the motion.  There were

02:01:51   23    attachments as exhibits to the response as well.

02:01:55   24          I've reviewed all of the briefing.  I've reviewed

02:01:58   25    all of those attachments.  Likewise, I have reviewed

| | |
|---|---|
| 02:02:02 | 1 multiple times Exhibits 5 and 6, I think, to the motion for |
| 02:02:12 | 2 summary judgment, which are the body camera footage from |
| 02:02:17 | 3 both officers involved. |
| 02:02:20 | 4 And, likewise, I've reviewed a number of the cases |
| 02:02:26 | 5 that the parties discuss in their briefing, most recently |
| 02:02:33 | 6 the Cole versus Carson case from the Fifth Circuit. |
| 02:02:35 | 7 So I feel like I am up to speed on the issues |
| 02:02:40 | 8 involved in this case and this motion, and I look forward |
| 02:02:44 | 9 to the parties' presentation this afternoon. |
| 02:02:47 | 10 Whoever wishes to go forward on the Defendant's |
| 02:02:50 | 11 motion may do so. |
| 02:02:50 | 12 MR. NOGA:  Thank you, Judge. |
| 02:02:56 | 13 Darrell Noga on behalf of Defendant, Officer |
| 02:02:58 | 14 Bristow. |
| 02:02:58 | 15 Judge, some events may be tragic and yet lawful, |
| 02:03:04 | 16 and that is what we have here.  We have asserted qualified |
| 02:03:08 | 17 immunity, and as the Court knows, qualified immunity allows |
| 02:03:12 | 18 government actors to know that they're not going to be |
| 02:03:16 | 19 liable as long as their actions are reasonable in light of |
| 02:03:19 | 20 current law. |
| 02:03:19 | 21 That leads us to a two-step analysis that the |
| 02:03:23 | 22 Court has to consider. |
| 02:03:24 | 23 Number one, has a constitutional or statutory |
| 02:03:27 | 24 violation occurred? |
| 02:03:28 | 25 Number two, was the law so clearly established |

02:03:31    1  that every reasonable officer would have known the conduct

02:03:34    2  at issue was illegal at the time of the action?

02:03:37    3       Now, the question of objective reasonableness is

02:03:42    4  one of law for the Court.  It is not a question for the

02:03:45    5  jury to judge in 20/20 hindsight.

02:03:48    6       Our Supreme Court has been very strict and very

02:03:51    7  consistent that in declaring whether a police officer had

02:03:54    8  fair notice that his or her conduct was unlawful, you

02:03:58    9  cannot take clearly established law at a high level of

02:04:02   10  generality.  It has to be particularized to the case facts,

02:04:07   11  and the case law and precedent has to put the question

02:04:10   12  beyond doubt.

02:04:11   13       Now, I am going to be -- if the Court will indulge

02:04:14   14  me, I want to focus later on two cases.  One of them, the

02:04:19   15  Wilson versus City of Bastrop case, which is a Fifth

02:04:23   16  Circuit case, 26 F.4th, 709.

02:04:28   17       THE COURT:  It's in the briefing?

02:04:28   18       MR. NOGA:  Yes, Your Honor.

02:04:29   19       And another one that's also in the briefing -- we

02:04:32   20  cited it multiple times because it's factually on point,

02:04:36   21  Thomas Garza v. Briones, also a Fifth Circuit case, and

02:04:39   22  that one is 943 F.3d 740.

02:04:42   23       The one case -- quite recently, Bastrop is a 2022

02:04:48   24  case from the Fifth Circuit, and Briones -- Garza v.

02:04:52   25  Briones is a 2019 case.

02:04:54  1          And, Judge, before I get to that, it's a high

02:04:56  2  burden -- I want to point out that when qualified immunity

02:04:58  3  is asserted, the burden then becomes that of Plaintiff to

02:05:03  4  overcome it and to show that the conduct was objectively

02:05:06  5  unreasonable as a matter of law in light of established

02:05:10  6  precedent.

02:05:10  7          THE COURT:  Mr. Noga, can I ask you to slow down

02:05:13  8  just a little bit for me?

02:05:14  9          MR. NOGA:  Sure.  Absolutely, Your Honor.

02:05:15  10         I would also state that I want the Court to please

02:05:19  11  keep in mind that qualified immunity represents the norm.

02:05:23  12  That's what our U.S. Supreme Court told us in Harlow v.

02:05:27  13  Fitzgerald, 457 U.S. 800, and it's been the norm ever

02:05:32  14  since.

02:05:32  15         Now, when you apply that legal framework of

02:05:36  16  analysis to this case, Your Honor, I'm going to address why

02:05:39  17  there was no constitutional violation and why I believe

02:05:43  18  Officer Bristow should prevail on either or both prong.

02:05:47  19  Just as in the Wilson v. Bastrop case, the trial court

02:05:53  20  found both prongs favored qualified immunity, and then the

02:05:56  21  Fifth Circuit affirmed, saying there was no constitutional

02:05:58  22  violation on very similar facts and said we don't have to

02:06:01  23  reach that second prong that the District Court did.

02:06:05  24         But Officer Bristow's conduct, I'm going to argue,

02:06:08  25  was objectively reasonable as a matter of law in responding

02:06:12   1   to an angry, drunk, uncooperative man brandishing a

02:06:18   2   high-powered rifle with his finger on the trigger.  I'm

02:06:21   3   going to go through the unrebutted facts and evidence at

02:06:23   4   some point in time because I think it's critical for the

02:06:26   5   Court to understand the facts and the mindset that informed

02:06:28   6   the officer's belief that there was an imminent threat to

02:06:33   7   the safety of themselves and others.

02:06:35   8          THE COURT:  I don't want to sidetrack you, but I

02:06:39   9   think Officer Bristow testified that he did not know

02:06:41  10   whether his finger was or was not on the trigger; isn't

02:06:44  11   that correct?

02:06:44  12          MR. NOGA:  That is correct.  Officer McCraw said

02:06:46  13   his finger was on the trigger --

02:06:48  14          THE COURT:  Okay.

02:06:48  15          MR. NOGA:  -- and technically his thumb.  Officer

02:06:52  16   McCraw testified the thumb was on the trigger, and he could

02:06:52  17   see it.  And Bristow said he wasn't sure.  He saw the hand

02:06:56  18   down by the trigger area.  That's correct, Your Honor.

02:06:58  19          But before I do so, I do want to also call the

02:07:04  20   Court's attention that it can take any prong of that

02:07:08  21   two-prong analysis first in studying qualified immunity,

02:07:12  22   and in that case, from my argument, I believe there are

02:07:16  23   some low-hanging fruit, so to speak, in terms of the

02:07:20  24   clearly established law prong.

02:07:22  25          THE COURT:  Well, I don't want to sidetrack you

| | |
|---|---|
| 02:07:23 | 1 |
| 02:07:27 | 2 |
| 02:07:31 | 3 |
| 02:07:35 | 4 |
| 02:07:37 | 5 |
| 02:07:42 | 6 |
| 02:07:46 | 7 |
| 02:07:48 | 8 |
| 02:07:51 | 9 |
| 02:07:54 | 10 |
| 02:07:58 | 11 |
| 02:08:00 | 12 |
| 02:08:05 | 13 |
| 02:08:08 | 14 |
| 02:08:11 | 15 |
| 02:08:12 | 16 |
| 02:08:14 | 17 |
| 02:08:19 | 18 |
| 02:08:22 | 19 |
| 02:08:23 | 20 |
| 02:08:26 | 21 |
| 02:08:28 | 22 |
| 02:08:32 | 23 |
| 02:08:35 | 24 |
| 02:08:40 | 25 |

here, but how does the Plaintiff characterize or articulate

the clearly established law before we get very -- very far?

MR. NOGA:  Well, the Plaintiff cites Cole v.

Carson and while yet admitting in his briefing that it is

not factually on point.  I can tell you that looking at the

dissents in Cole v. Carson -- and I was going to get to

that and distinguish it, Your Honor -- I think that's --

even Plaintiff in his brief -- I don't want to misstate

him, but I think he does put a line in there honestly

saying this is not factually quite on point because in Cole

v. Carson there was a factual dispute that was material as

to whether the victim was even aware of police presence.

He walked out of some bushes with a gun, and there was

dispute over when the shots were fired, what warnings were

given, and so forth.

THE COURT:  So in the briefing or anywhere else,

other than citing the Cole case, is there any articulation

by the Plaintiff of what the clearly established law

involved here is?

MR. NOGA:  None, Your Honor.  And in fairness to

Plaintiff, that's because the cases that I just cited to

you and other cases cited in those opinions put clearly

established law to show that Officer Bristow's conduct was

lawful.  Those cases involved situations where the

person -- one did not even have a gun, one where he had his

8

| | | |
|---|---|---|
| 02:08:44 | 1 | back turned to the officer and was fleeing from him.  And |
| 02:08:46 | 2 | the Fifth Circuit -- and I will quote directly -- and if |
| 02:08:49 | 3 | you'll indulge me, it's important to go into some detail in |
| 02:08:52 | 4 | the rationale.  The Fifth Circuit said we've never required |
| 02:08:55 | 5 | anyone to point the gun at an officer, we've never required |
| 02:08:58 | 6 | anyone to actually shoot the gun, we've never required even |
| 02:09:03 | 7 | the person to be facing the officer for the officer to |
| 02:09:06 | 8 | have -- be able to show that there was an objective |
| 02:09:09 | 9 | reasonable basis for believing the person was a threat. |
| 02:09:11 | 10 | THE COURT:  That may be true, but that's from the |
| 02:09:13 | 11 | dissent, is it not? |
| 02:09:14 | 12 | MR. NOGA:  No, Your Honor.  That's from the |
| 02:09:16 | 13 | majority -- are you talking about Cole v. Carson, Your |
| 02:09:21 | 14 | Honor? |
| 02:09:21 | 15 | THE COURT:  Yes. |
| 02:09:21 | 16 | MR. NOGA:  No, no, I'm talking about Wilson and |
| 02:09:23 | 17 | I'm talking -- the Fifth Circuit decision in Wilson and the |
| 02:09:26 | 18 | Fifth Circuit decision in Garza.  There's actually six or |
| 02:09:28 | 19 | seven dissents, I believe, in Cole v. Carson.  Judge Ho and |
| 02:09:33 | 20 | Judge Oldham had a dissent, Judge Smith had a dissent, |
| 02:09:34 | 21 | Judge Jones had a dissent, even Judge Willett had a |
| 02:09:40 | 22 | dissent.  And the fact of the matter was that that case had |
| 02:09:43 | 23 | material facts that you don't have a dispute on in this |
| 02:09:46 | 24 | case. |
| 02:09:46 | 25 | THE COURT:  I'm not disagreeing with you.  I'm |

02:09:48    1   asking about the language about we've never required anyone

02:09:51    2   to actually shoot the gun or to be facing the officer.

02:09:55    3   That's referenced in one of the dissents.  But it's -- it's

02:09:58    4   a minor point.

02:09:59    5        MR. NOGA:  Yes, Your Honor.  Thank you.

02:10:00    6        THE COURT:  You can move on.

02:10:01    7        MR. NOGA:  Yeah.

02:10:02    8        And, again, just to answer Your Honor where I was

02:10:06    9   referencing, in Footnote 3, for instance, on Wilson, it

02:10:09   10   says:  For similar reasons, we reject Plaintiff's argument

02:10:13   11   that Johnson posed no threat because he never actually

02:10:16   12   aimed his gun at an officer.  Plaintiff's identify no basis

02:10:21   13   for second-guessing an officer's split second judgment that

02:10:23   14   a fleeing armed suspect could turn a gun on him at a

02:10:27   15   moment's notice.

02:10:27   16        It also rejected an argument that the suspect made

02:10:29   17   no threatening gestures, citing the Ramirez v. Knoulton

02:10:34   18   case in the footnote, 542 F.3d 124.  And it says -- in the

02:10:38   19   opinion I'm quoting in Wilson, it said:  Our precedent

02:10:41   20   rejects that argument.  We have never required officers to

02:10:45   21   wait until a Defendant turns toward them with weapon in

02:10:48   22   hand before applying deadly force to ensure their safety.

02:10:51   23        And that's, again, at -- at -- I've got the Lexis

02:10:56   24   cite.  It's at 10 on the Lexis cite, and I believe it's at

02:11:00   25   709 and 714 on F.3d, citing the Salazar-Limon versus City

| | | |
|---|---|---|
| 02:11:07 | 1 | of Houston case. |
| 02:11:07 | 2 | And I believe where I was going with this, Judge, |
| 02:11:10 | 3 | is that the Fifth Circuit agreed that there was no |
| 02:11:14 | 4 | constitutional violation in Wilson, and the facts are |
| 02:11:16 | 5 | extremely analogous.  And to the extent that it is |
| 02:11:19 | 6 | Plaintiff's burden to put a case that admittedly doesn't |
| 02:11:24 | 7 | have to be identical but has to put the question beyond a |
| 02:11:27 | 8 | doubt shows when we look at the Wilson and the Garza cases |
| 02:11:30 | 9 | that the -- those cases told Officer Bristow that his |
| 02:11:34 | 10 | conduct was lawful. |
| 02:11:36 | 11 | So the precedent clearly established law, if you |
| 02:11:39 | 12 | read those decisions by the Fifth Circuit, which are good |
| 02:11:42 | 13 | law, tell us that the actions were reasonable -- |
| 02:11:46 | 14 | objectively reasonable under the circumstances because |
| 02:11:48 | 15 | they're so analogous to the facts we have. |
| 02:11:51 | 16 | Ours are even more direct and dramatic in the |
| 02:11:54 | 17 | facts, Judge, because we, unlike a person walking out of |
| 02:11:59 | 18 | the bushes in Cole v. Carson who may not have known the |
| 02:12:03 | 19 | police were there, we have a confrontation.  We have |
| 02:12:06 | 20 | commands to drop the weapon.  We have a clear and present |
| 02:12:09 | 21 | danger, as I'm going to quote from the evidence. |
| 02:12:10 | 22 | So I think, again, you know, we're not talking |
| 02:12:15 | 23 | about 20/20 hindsight, but when you're looking at that |
| 02:12:18 | 24 | clearly established law prong, Plaintiff -- this is not a |
| 02:12:20 | 25 | case where -- for instance, Judge, we have cases where |

02:12:23   1   after a suspect is secured and in handcuffs, right, he was

02:12:27   2   beaten again.  And the Court said we have plenty of

02:12:31   3   authority that says once the suspect is secured and once

02:12:34   4   you're -- you're not allowed to continue to inflict

02:12:37   5   physical force when it's unnecessary.  That is what I would

02:12:40   6   call clearly established law.

02:12:42   7       Plaintiff also tries to cite -- and since you

02:12:45   8   brought it up, Judge, he tries to cite the Eighth Amendment

02:12:49   9   cruel and unusual, we'll know it when we see it type of

02:12:52   10  cases like Hope versus Pelzer.  Those are totally

02:12:56   11  inapposite.  Hope verus Pelzer is a prisoner chained in a

02:13:00   12  yard in the sun, not allowed to go to the bathroom.  It's a

02:13:04   13  prison punishment case, and it has no bearing or relevance

02:13:08   14  on this case.

02:13:09   15      The last time -- those are rare cases.  And the

02:13:12   16  last Supreme Court case that cited that was one where it

02:13:15   17  involved the conditions in a jail where they left the

02:13:19   18  prisoner without clothes and in the cold and in human

02:13:23   19  waste.  And the Supreme Court said, okay, we don't need a

02:13:26   20  case where somebody else has been laying in human waste,

02:13:30   21  and it's -- without clothes to know that this is a

02:13:33   22  violation, right?  It's an Eighth Amendment type of cruel

02:13:36   23  and unusual punishment situation like Hope v. Pelzer.  It's

02:13:36   24  not at all applicable to this.

02:13:42   25      This is -- we have plenty of cases that deal with

02:13:45   1   use of deadly force and excessive force that outline

02:13:48   2   parameters for when actions are reasonable.  And it is the

02:13:52   3   burden of this Court to look, as a matter of law, and say

02:13:56   4   were the actions at issue reasonable?

02:13:58   5        I quoted -- I quoted the language from Wilson, but

02:14:03   6   Garza also said that.  The arguments in Garza were

02:14:07   7   rejected, and they're similar to the arguments that were

02:14:08   8   advanced by opposing counsel in this case, said Plaintiff

02:14:12   9   was claiming that the District Court didn't look at the

02:14:15   10   totality of circumstances analysis properly in Garza

02:14:19   11   because it -- he was arguing that it didn't show that Garza

02:14:23   12   threatened anyone, he wasn't running from them, and it was

02:14:26   13   a minor offense he was being investigated for.

02:14:29   14        And the Court rejected all of that.  They said

02:14:32   15   these facts don't change the facts that are material to the

02:14:36   16   use of deadly force, namely whether he did not respond to

02:14:40   17   commands to drop his gun.  And, again, were the officers

02:14:44   18   confronting -- and I'll quote -- based on those facts which

02:14:48   19   suggest that the officers thought they were confronting an

02:14:51   20   unpredictable man armed with a dangerous weapon, which is

02:14:55   21   what we had here, Defendants had probable cause to conclude

02:14:59   22   that Garza posed him a serious threat of physical injury or

02:15:03   23   death.  Police officers may use deadly force in those

02:15:05   24   circumstances without violating the Fourth Amendment.

02:15:07   25        So if you look at that, the key for you, Judge, is

02:15:11    1    did Officer Bristow have probable cause to reasonably

02:15:14    2    believe that Mr. Carico posed a serious threat to his own

02:15:19    3    safety, Officer McCraw's safety, Carico's then girlfriend,

02:15:25    4    Ms. Reger's safety, or to safety of others unknown.

02:15:29    5          THE COURT:  So what exactly -- how would you

02:15:31    6    articulate the serious threat at that point -- at the point

02:15:36    7    where the shot was fired?  What was the serious threat?

02:15:40    8          MR. NOGA:  Fair enough, Judge.  And if you will

02:15:42    9    indulge me just briefly because I think it's important, I

02:15:45   10    think that's best responded to by referring to the

02:15:48   11    officer's own sworn statements.

02:15:50   12          Bristow told the Texas Rangers:  Plaintiff Carico

02:15:56   13    opened the storm door of the residence, took multiple steps

02:16:00   14    toward Kayla and --

02:16:00   15          THE COURT:  Can you cite me for where you are in

02:16:02   16    that statement?  That will help me.

02:16:04   17          MR. NOGA:  Yes, Judge.  That's on Page 12 and Page

02:16:08   18    13 of our motion for summary judgment, ECF Document 20.

02:16:11   19          THE COURT:  All right.  I'm there.  Okay.

02:16:12   20          MR. NOGA:  Okay.  And he said he presented a brown

02:16:16   21    woodgrain long hunting-style rifle.  He held the rifle

02:16:20   22    straight up and stated:  I'll blow my -- obscenity --

02:16:24   23    brains out.  Officer McCraw and I immediately gave Carico

02:16:27   24    multiple loud commands to drop the gun.  Kayla then swung

02:16:31   25    the storm door open further, and Carico abruptly turned and

02:16:34  1  began to walk back in the house with the gun.  Carico then

02:16:37  2  turned towards Officer McCraw and turned back to walk into

02:16:42  3  the residence.  After he entered the residence, which was a

02:16:45  4  metal construction, I knew the exterior walls could easily

02:16:48  5  be penetrated by a rifle round.  I was also unaware of

02:16:51  6  other individuals inside the residence.

02:16:54  7       And later, Judge, I'll interject, he said he heard

02:16:57  8  people talking in the house and thought there may be people

02:16:59  9  in there.  And McCraw wasn't sure either.

02:17:03  10       Due to the lighting of the interior of the house

02:17:06  11  and the position of Carico, I lost sight of the firearm.  I

02:17:10  12  could not tell which way the firearm was pointed as Carico

02:17:14  13  turned to walk back inside the residence.  I also knew

02:17:17  14  Carico was talking to somebody inside of the residence

02:17:18  15  prior to coming outside with the rifle.  We had not cleared

02:17:22  16  the interior of the residence, and I did not know if there

02:17:25  17  was another person inside the residence who may be shot by

02:17:28  18  Carico.  I knew that due to the style of firearm was a high

02:17:32  19  caliber rifle, I knew that our police vests could not

02:17:35  20  withstand a bullet from a high-powered caliber rifle.

02:17:38  21  Fearing that Carico might turn and fire a shot at Kayla who

02:17:41  22  was very close to him or turn again towards Officer McCraw,

02:17:44  23  I fired my duty weapon to stop Carico from shooting his

02:17:47  24  rifle.  I was in fear for the life and safety of Kayla,

02:17:51  25  Officer McCraw, myself, and anyone who might have been

02:17:53    1    inside the residence.

02:17:54    2         Now, McCraw says the same thing.  He corroborates

02:17:57    3    that in the paragraph after and says:  Upon seeing Carico

02:18:00    4    exit the home with the rifle, Officer Bristow and I both

02:18:03    5    drew our firearms and began yelling at him to drop his

02:18:07    6    weapon.  Carico refused to put down his rifle and turned to

02:18:10    7    enter the residence at which time Officer Bristow fired one

02:18:14    8    round striking him in the back just under his right

02:18:17    9    shoulder blade causing him to fall to the ground.  Although

02:18:20    10   I feared for the safety and life of someone inside the

02:18:23    11   residence, Officer Bristow's (sic) girlfriend or myself, I

02:18:25    12   did not fire my weapon because I did not have a clear line

02:18:30    13   of fire on Carico.

02:18:31    14        Now, Your Honor, I will also note that in the

02:18:35    15   deposition we attached as an exhibit to our summary

02:18:40    16   judgment motion, Officer Bristow -- and it's also

02:18:44    17   consistent -- he was asked at first by Plaintiff:  So you

02:18:47    18   basically, you know, had the only fact that he possessed a

02:18:52    19   gun and that he was holding a gun, was that sufficient to

02:18:56    20   justify your use of lethal force?

02:18:59    21        And that's on Page 64 of the deposition.

02:19:01    22        And Bristow responds:  There was more factors that

02:19:05    23   went into, and I've explained those factors to you that

02:19:07    24   it's very easy for him to turn around very quick and point

02:19:11    25   it at myself or Officer McCraw or Kayla or anything like

02:19:14    1    that.

02:19:14    2         And then later, on Pages -- and I'll refer you to

02:19:19    3    87 through 90 -- about 90 -- 98 -- 87 through 98 of the

02:19:26    4    deposition, he specifically goes through all the factors

02:19:30    5    that were in his mind that objectively supported his belief

02:19:35    6    that Carico was a threat to his safety of himself and

02:19:38    7    others.

02:19:39    8         He said:  When Carico stepped out, did you give

02:19:42    9    him any instructions?

02:19:44    10         I did.

02:19:45    11         What instructions were those?

02:19:47    12         Myself and Officer McCraw told him to drop the gun

02:19:50    13    multiple times.

02:19:50    14         Did Mr. Carico comply?

02:19:53    15         No.

02:19:54    16         Did Mr. Carico make any indication he was going to

02:19:54    17    comply?

02:19:54    18         No.

02:19:54    19         When he walked outside with the rifle, would you

02:19:54    20    describe where his hands were placed on the rifle?

02:20:00    21         His left hand was up on the barrel, and his right

02:20:06    22    hand was down on the wood by the trigger.

02:20:09    23         Could you tell if his finger was on the trigger?

02:20:11    24         I could not, but --

02:20:13    25         Then McCraw said in his deposition:  I saw his

02:20:14    1   thumb on the trigger.

02:20:14    2        Based on your observation, was it possible his

02:20:14    3   finger was on the trigger?

02:20:14    4        Yes.

02:20:19    5        Is there any significance that he walked outside

02:20:21    6   with his rifle with his hand possibly on the trigger?

02:20:23    7        Yes.

02:20:24    8        What's that?

02:20:25    9        It's very easy to turn the gun and shoot it in

02:20:30   10   another direction.

02:20:31   11        How long do you think it would have taken

02:20:33   12   Mr. Carico to point that gun at Officer McCraw?

02:20:35   13        Less than a second.

02:20:37   14        And remember, when he turned to walk back into the

02:20:39   15   house, he was now in line with McCraw.

02:20:41   16        Less than a second.

02:20:44   17        How long do you think it would have taken Carico

02:20:46   18   to point that weapon at Ms. Reger?

02:20:49   19        Less than a second.

02:20:50   20        How long would it have taken Mr. Carico to point

02:20:52   21   that weapon at you?

02:20:53   22        Less than a second.

02:20:54   23        How would you describe his state of agitation?

02:20:57   24        It was very high.  He was agitated, very agitated.

02:21:01   25        Did that factor into your fear in the moment?

| | | |
|---|---|---|
| 02:21:03 | 1 | Yes. |
| 02:21:04 | 2 | Why? |
| 02:21:04 | 3 | Because when you -- when generally people get mad, |
| 02:21:07 | 4 | whenever they get agitated, they kind of act out and do |
| 02:21:10 | 5 | things that they probably normally wouldn't. |
| 02:21:12 | 6 | In your conversations with Ms. Reger, did she make |
| 02:21:15 | 7 | any comments that would make you believe Mr. Carico was |
| 02:21:19 | 8 | upset or angry? |
| 02:21:20 | 9 | Yes. |
| 02:21:20 | 10 | Did she make any comments to make you think |
| 02:21:23 | 11 | Mr. Carico was upset or angry with her? |
| 02:21:25 | 12 | Yes. |
| 02:21:26 | 13 | And then he says:  How long would it have taken to |
| 02:21:28 | 14 | turn around and open fire if he is going back into the |
| 02:21:32 | 15 | house? |
| 02:21:33 | 16 | A little over a second or two seconds. |
| 02:21:34 | 17 | And would that have been directed at the three |
| 02:21:36 | 18 | standing outside? |
| 02:21:37 | 19 | Yes. |
| 02:21:38 | 20 | Would you explain the difference between a 308 and |
| 02:21:41 | 21 | a 9 millimeter weapon? |
| 02:21:42 | 22 | The 308 rifle was what Mr. Carico had.  A 308 is |
| 02:21:46 | 23 | designed to have more punch, go a lot farther, go a lot |
| 02:21:50 | 24 | faster, bring down big game animals and other things.  I |
| 02:21:53 | 25 | know people hunt elk and everything else with it. |

02:21:53    1        Would it be fair to say it's more powerful than a

02:21:59    2   9 millimeter?

02:22:00    3        Yes.

02:22:01    4        With the body armor that you were wearing, would

02:22:01    5   your body armor have been able to withstand a shot from a

02:22:01    6   308?

02:22:06    7        No, sir.

02:22:07    8        When you went into the house, one of the things

02:22:09    9   you did was move Mr. Carico's firearm, correct?

02:22:12   10        THE COURT:  Mr. Noga, I've got to ask you to slow

02:22:12   11   down a little bit.

02:22:13   12        MR. NOGA:  I'm sorry again, Judge.

02:22:13   13        When you went into the house, one of the first

02:22:21   14   things you did was move away Mr. Carico's firearm; is that

02:22:24   15   correct?

02:22:24   16        Yes, sir.

02:22:25   17        Would it be fair to say when you walked in the

02:22:28   18   house that firearm was still within the reach of

02:22:30   19   Mr. Carico?

02:22:31   20        Yes.

02:22:32   21        And when you were considering whether or not to

02:22:35   22   open fire, did Mr. -- and there was a round in the chamber,

02:22:38   23   by the way -- did Mr. Carico's state of intoxication play a

02:22:44   24   factor?

02:22:44   25        Yes.

02:22:45    1          How did that play a factor?

02:22:46    2          Because from my dealings with intoxicated

02:22:49    3    subjects, they make kind of quick and bad judgments and

02:22:53    4    don't -- they're not really thinking clearly, so they're

02:22:55    5    very kind of -- you never know what's going to come next

02:22:58    6    with them.

02:22:59    7          And said:  Was he acting in an irrational manner?

02:23:04    8          Yes.

02:23:05    9          Did his agitated behavior play a role in your

02:23:07    10   decision to open fire that night?

02:23:08    11         Yes.

02:23:08    12         How did his behavior contribute to that?

02:23:11    13         Due to his agitation and Kayla already saying,

02:23:15    14   well, now he's going to be mad at me, I could only assume

02:23:17    15   that he was mad at the whole situation, mad that officers

02:23:21    16   were at his front door.  I was afraid he would turn around

02:23:25    17   and take his anger out on myself, Mr. McCraw, or Kayla.

02:23:30    18         With regard to him bringing a weapon or a

02:23:33    19   high-powered rifle into the interaction, was there any

02:23:35    20   reason for him to do that?

02:23:37    21         None, no.

02:23:38    22         The fact that he was intoxicated and agitated,

02:23:41    23   would it be fair that that heightened the concern about how

02:23:44    24   he might use the firearm?

02:23:46    25         Yes.

02:23:47    1       Did Carico's failure to respond to your commands

02:23:49    2 to drop the weapon, did that play a role in your shot that

02:23:54    3 evening in choosing to shoot?

02:23:57    4       Yes.

02:23:58    5       What role?

02:23:59    6       He did not drop the weapon when me and Officer

02:24:02    7 McCraw told him to.  And whenever I lost sight of it, I

02:24:04    8 could not tell where it was pointing, so that's when I

02:24:07    9 decided to fire.

02:24:08   10       And then there was testimony about the possibility

02:24:11   11 of another person being inside the residence.

02:24:14   12       And he said:  Why did you think that?

02:24:16   13       Because during one of the times he shut the door,

02:24:18   14 I could hear him.  Kayla was outside with us.  I could hear

02:24:22   15 him inside talking.  I didn't know who he was talking to.

02:24:26   16 I didn't know if he was on the phone.  I didn't know if

02:24:30   17 there was anybody else inside.

02:24:31   18       Did the possibility of another person being inside

02:24:33   19 the residence play a role in your decision to open fire

02:24:37   20 that night?

02:24:37   21       Yes.

02:24:38   22       What role did that play?

02:24:40   23       If there's a third party in there, then if he

02:24:43   24 returned inside that house with the firearm, he was already

02:24:46   25 acting irrational, we could have had a possibly barricaded

02:24:51   1   subject with a hostage.

02:24:53   2          And then it said:  Did Mr. Carico's decision to

02:24:56   3   turn toward the residence or toward the house play a factor

02:24:59   4   in your decision?

02:25:00   5          Yes.

02:25:01   6          Did it force you to make a split second decision?

02:25:04   7          Yes.

02:25:05   8          If Mr. Carico had just remained standing outside

02:25:07   9   the residence, would that have given you more of an

02:25:10  10   opportunity to assess or deal with the situation?

02:25:13  11          Yes.

02:25:14  12          Did Mr. Carico's decision heighten your fear?

02:25:17  13          Yes.

02:25:18  14          And the reason being later, it's testified in the

02:25:21  15   earlier deposition that he could have sought cover in the

02:25:24  16   house, and whatever the walls of the house were, the

02:25:26  17   officers testified to they were afraid that they would then

02:25:30  18   lose track of him, lose sight of him, and he could fire

02:25:35  19   from within the house, and they wouldn't know where it was

02:25:35  20   coming from.

02:25:37  21          And I believe there was also testimony, Your

02:25:39  22   Honor, that the 308 would be able to fire rounds through

02:25:42  23   the thin metal walls of that residence.

02:25:45  24          So -- and I will refer for a corroborating factor

02:25:49  25   to Officer McCraw's deposition on Page 49 through 52, and

02:25:55    1   Officer McCraw said -- they asked him:  Did that contribute

02:25:59    2   to your thought that opening fire would be justified?

02:26:02    3         Yes.

02:26:03    4         Why is that?

02:26:04    5         With him putting his thumb on the trigger, that

02:26:07    6   makes him more of a threat.  He's prepared to do whatever

02:26:10    7   the case may be.  It's not just standing there holding the

02:26:14    8   firearm.  He's not just holding the firearm without his

02:26:17    9   hand on the trigger, he's got his finger on the trigger,

02:26:20   10   and he was ready to act.

02:26:22   11         How much more of a threat was he having that

02:26:24   12   finger down on the trigger?

02:26:26   13         A hundred percent more of a threat with his finger

02:26:28   14   on the trigger.

02:26:30   15         Now, it says:  In watching the video, Officer

02:26:34   16   Bristow didn't open fire until Mr. Carico turned to go

02:26:37   17   inside the residence.  Do you remember seeing that from the

02:26:40   18   video?

02:26:41   19         Yes, sir.

02:26:42   20         Would that have contributed to you thinking he may

02:26:45   21   or may not pose a threat?

02:26:47   22         No, sir.

02:26:47   23         He said:  Would a 308 be able to fire at you -- at

02:26:53   24   y'all through the walls of his residence?

02:26:55   25         Yes, sir.

| | | |
|---|---|---|
| 02:26:56 | 1 | What weapon did you have that night? |
| 02:26:58 | 2 | I had a Springfield XD Mod 2, 9 millimeter. |
| 02:27:03 | 3 | Would you have been able to return fire through |
| 02:27:06 | 4 | the wall of his residence? |
| 02:27:07 | 5 | No, sir. |
| 02:27:08 | 6 | Would being back in the residence have given him |
| 02:27:09 | 7 | additional cover if there was a fire fight between the two |
| 02:27:11 | 8 | of you and Mr. Carico? |
| 02:27:13 | 9 | Yes, sir. |
| 02:27:15 | 10 | With the body armor that you were wearing that |
| 02:27:17 | 11 | day, would the body armor have been able to stand up to a |
| 02:27:19 | 12 | 308 round? |
| 02:27:20 | 13 | No, sir. |
| 02:27:23 | 14 | And they talked about him -- Officer Bristow -- |
| 02:27:25 | 15 | Officer McCraw describes him as coming out with intent, and |
| 02:27:28 | 16 | the question was:  Did that make you fear for your life? |
| 02:27:31 | 17 | Answer:  A hundred percent.  I feared for |
| 02:27:34 | 18 | everybody's life who was there. |
| 02:27:37 | 19 | And I think that one point I want to also |
| 02:27:43 | 20 | emphasize, Your Honor, is that I don't believe that any of |
| 02:27:45 | 21 | the evidence attached to the response from opposing counsel |
| 02:27:51 | 22 | was anything other than what we attached.  So my point of |
| 02:27:55 | 23 | emphasis is that with the video you have and with the |
| 02:27:59 | 24 | corroborating sworn testimony from both officers, both in |
| 02:28:01 | 25 | their statements to the Texas Rangers, which were |

02:28:04  1   consistent, and in their deposition testimony, you have a

02:28:08  2   whole host of facts out there that lead support for the

02:28:13  3   fact that they had a reasonable -- objectively reasonable

02:28:16  4   belief that Mr. Carico was a danger and a threat.

02:28:21  5        And I would suggest that those cases that I cited

02:28:24  6   where in one case the man was waving -- Garza -- he was

02:28:29  7   waving around a BB gun.  They didn't know that.

02:28:31  8        THE COURT:  So can I ask you about something

02:28:33  9   that's in the Plaintiff's response, and I'll obviously give

02:28:36  10  him a chance to address it as well.

02:28:38  11       MR. NOGA:  Yes, Your Honor.

02:28:39  12       THE COURT:  But at the bottom of Page 7 in the

02:28:41  13  Plaintiff's response, Plaintiff writes that Officer Bristow

02:28:45  14  was unable to identify any specific conduct that justified

02:28:51  15  his decision to shoot Mr. Carico in the back, except for

02:28:55  16  being in possession of a gun.

02:28:59  17       Is that correct?

02:29:00  18       MR. NOGA:  No, Judge, it's not.  And that's why I

02:29:03  19  went through -- he tried to ask him that question in his

02:29:05  20  deposition, and that's why I read the -- that same question

02:29:08  21  from him first.  And Bristow said:  No, I gave you a whole

02:29:13  22  host of factors that went into the decision to shoot.  And

02:29:16  23  then I read you all of the factors that Bristow went

02:29:19  24  through saying:  Here are all the things that went into my

02:29:21  25  decision to shoot.

| | | |
|---|---|---|
| 02:29:23 | 1 | And I'm sorry, but that's just a misstatement. |
| 02:29:25 | 2 | Read the deposition testimony.  Everything I just read to |
| 02:29:28 | 3 | you from those pages is Bristow outlining numerous factors |
| 02:29:33 | 4 | as to why he reasonably thought there was a threat to his |
| 02:29:37 | 5 | life and the safety of others. |
| 02:29:38 | 6 | THE COURT:  And all that's in the record? |
| 02:29:40 | 7 | MR. NOGA:  Yes.  Yes, Judge. |
| 02:29:41 | 8 | And -- and just to be real clear, I would like you |
| 02:29:44 | 9 | to take that assertion by Plaintiff and compare it to the |
| 02:29:50 | 10 | deposition testimony of Officer Bristow that I read and the |
| 02:29:56 | 11 | deposition testimony of Officer McCraw. |
| 02:29:59 | 12 | THE COURT:  Is there anything that is on the body |
| 02:30:03 | 13 | cam footage of Officer McCraw that's different from what is |
| 02:30:06 | 14 | seen on Officer Bristow's body cam? |
| 02:30:09 | 15 | MR. NOGA:  Other than the angle, no.  The one |
| 02:30:11 | 16 | thing you can see is that Bristow had a little different |
| 02:30:15 | 17 | perspective because McCraw was stationed aside.  And when |
| 02:30:18 | 18 | McCraw was asked why he didn't shoot, he later -- because |
| 02:30:22 | 19 | Kayla, the girlfriend, was in my line of fire, I couldn't. |
| 02:30:25 | 20 | And when Mr. Carico was turning to go back in the |
| 02:30:29 | 21 | house, you can see the different angle.  He actually turns |
| 02:30:33 | 22 | toward where Officer McCraw's position is, and that's why |
| 02:30:35 | 23 | the testimony I just read where Officer Bristow said I |
| 02:30:39 | 24 | couldn't tell where the gun was pointed, I lost sight of |
| 02:30:43 | 25 | where the gun was -- |

| | |
|---|---|
| 02:30:45 | 1 |
| 02:30:48 | 2 |
| 02:30:51 | 3 |
| 02:30:55 | 4 |
| 02:30:57 | 5 |
| 02:31:04 | 6 |
| 02:31:07 | 7 |
| 02:31:11 | 8 |
| 02:31:13 | 9 |
| 02:31:18 | 10 |
| 02:31:22 | 11 |
| 02:31:25 | 12 |
| 02:31:28 | 13 |
| 02:31:31 | 14 |
| 02:31:37 | 15 |
| 02:31:39 | 16 |
| 02:31:42 | 17 |
| 02:31:46 | 18 |
| 02:31:49 | 19 |
| 02:31:53 | 20 |
| 02:31:55 | 21 |
| 02:31:59 | 22 |
| 02:32:05 | 23 |
| 02:32:08 | 24 |
| 02:32:11 | 25 |

THE COURT:  He turns in a counterclockwise manner?

MR. NOGA:  I believe so, Judge.  Yeah, he turns to go back in, and he still had the rifle in hand.  And the -- the pages that I was referring to -- again, Judge, if you would take a look at -- the part on Page 64 is where Officer Bristow refutes Plaintiff's attorney's deposition said:  I gave you a whole host of factors as to what went into my decision.

And then the pages I read to you from Pages 81 on through 90 -- 98, 81 through 98 goes through all the factors that Bristow testified to, and they're consistent with what he told the Rangers.

And, Judge, I will tell you that this Court -- you're familiar with this situation in a less dramatic way because you upheld qualified immunity in a case -- I believe it was called Grigsby, a few years ago where somebody was brandishing a shiny object in his right hand and the officer shot him because the officer thought it was a knife.  It was not.  But the facts supported a reasonable belief that the officer was in fear for his safety.

Again, in this case, Judge, it's not a stretch. The whole issue is not that this is a tragedy.  It is a tragic result.  Nobody disputes that.  And if you look at the video and run it all the way, you're going to see Officer Bristow in tears, crying after this is all over.

|  |  |  |
|---|---|---|
| 02:32:15 | 1 | But he did -- he made the decision he had to make |
| 02:32:17 | 2 | because of the factors involved.  And anyone who is |
| 02:32:19 | 3 | standing in a front yard with somebody with a high-powered |
| 02:32:24 | 4 | rifle and it is inarguable that they can turn and point |
| 02:32:27 | 5 | that any direction in a split second, and unlike the other |
| 02:32:32 | 6 | case that Plaintiff cites, and it certainly doesn't apply |
| 02:32:35 | 7 | to the Cole v. Carson case -- unlike the other case that |
| 02:32:39 | 8 | Plaintiff cites, we have multiple commands, drop the rifle, |
| 02:32:43 | 9 | put the rifle -- both officers pulled their guns when he |
| 02:32:47 | 10 | came out with the rifle.  They didn't shoot right away. |
| 02:32:50 | 11 | And I believe in the deposition, Plaintiff was |
| 02:32:52 | 12 | asked -- asking Officer Bristow:  Why didn't you shoot him |
| 02:32:55 | 13 | right when he came out the door with the rifle?  And |
| 02:32:59 | 14 | Bristow was like:  Well, I -- first I drew my gun.  I was |
| 02:33:01 | 15 | trying to process the situation, and it was so quick.  But |
| 02:33:03 | 16 | he didn't shoot right away. |
| 02:33:05 | 17 | And when he and McCraw both drew their guns |
| 02:33:09 | 18 | roughly at the same time, both of them told him put the |
| 02:33:11 | 19 | rifle down.  Nothing would have happened if he would have |
| 02:33:15 | 20 | done that.  Or even if he would have taken the rifle and |
| 02:33:21 | 21 | held it out here one hand by the barrel, okay?  But when |
| 02:33:23 | 22 | you've got it in your hand, it takes a split second to use |
| 02:33:25 | 23 | it when you've got an agitated, angry drunk person. |
| 02:33:30 | 24 | There's no rebuttable testimony there.  Everybody said he |
| 02:33:33 | 25 | appeared drunk.  He certainly was angry.  He's intoxicated. |

| | | |
|---|---|---|
| 02:33:37 | 1 | He was erratic, and he was threatening.  And he had a |
| 02:33:43 | 2 | high-powered rifle in his hand. |
| 02:33:45 | 3 | Now, if he goes in that house, this is not a case |
| 02:33:48 | 4 | where we're playing 20/20 hindsight.  This is not a case -- |
| 02:33:48 | 5 | Plaintiff basically wants you to say, let this go to the |
| 02:33:51 | 6 | jury.  Let me try to convince the jury he wasn't really a |
| 02:33:54 | 7 | risk.  Those cases I read you and the related Fifth Circuit |
| 02:33:57 | 8 | cases that are cited in Garza and in Bastrop, all those |
| 02:34:03 | 9 | cases say that's not relevant.  That's not for a jury to |
| 02:34:10 | 10 | decide. |
| 02:34:11 | 11 | The case is, as a matter of law, was there facts |
| 02:34:14 | 12 | known to the officer, the totality of facts that led him to |
| 02:34:18 | 13 | have probable cause to reasonably believe Carico was a |
| 02:34:22 | 14 | threat, an immediate danger? |
| 02:34:24 | 15 | And he could have done any number of things. |
| 02:34:26 | 16 | Plaintiff says:  Well, he was heading back to the house. |
| 02:34:29 | 17 | Plaintiff says:  He didn't really point the gun at you. |
| 02:34:31 | 18 | That's not required.  It can be pointed at you in a split |
| 02:34:35 | 19 | second, and all the cases at the Fifth Circuit say he |
| 02:34:38 | 20 | doesn't have to point the gun at you. |
| 02:34:40 | 21 | Plaintiff also makes an argument, well, they |
| 02:34:42 | 22 | didn't tell him they were going to use deadly force.  First |
| 02:34:45 | 23 | of all, when officers have their guns drawn, I think that's |
| 02:34:48 | 24 | a pretty clear signal.  But more than that, the case law |
| 02:34:51 | 25 | doesn't require them to.  There is no case that says you |

02:34:54    1    first -- while somebody has a gun or is pointing a gun at

02:34:58    2    you, you first have to say:  I'm going to shoot you if you

02:35:01    3    don't stop pointing that gun at me.  No such case.  And the

02:35:01    4    practicalities are obvious, and the Fifth Circuit's upheld

02:35:07    5    those practicalities.

02:35:07    6         So now you have a situation where he said, oh,

02:35:10    7    well, he wasn't going to do anything.  His subjective

02:35:12    8    intent is also irrelevant.  It's the facts at the scene,

02:35:18    9    intense and evolving circumstances.  And if he goes in that

02:35:21    10   house, he could have done a lot of things.  As he's heading

02:35:24    11   in the door, he could have turned around and fired.  If he

02:35:27    12   had got in the house, they wouldn't know where he's at.  He

02:35:31    13   could have taken potshots at them from inside the house.

02:35:31    14   You knew he had a rifle.  There's no doubt he has access to

02:35:34    15   it.  When they went and got the rifle from him after the

02:35:37    16   one shot that incapacitated him, it was loaded.  It had

02:35:41    17   bullets in it.

02:35:42    18        So -- you know -- and, again, to a certain extent,

02:35:45    19   it's immaterial in the fact that we've got cases where a BB

02:35:50    20   gun was deemed to be an appropriate threat if the officers

02:35:53    21   had a reasonable belief it looked like a weapon, your case

02:35:56    22   where the shiny object in the hand was deemed a reasonable

02:35:59    23   threat to uphold qualified immunity in Grigsby, and then

02:36:05    24   you've got the Garza case.  And then you've got Wilson

02:36:08    25   where he's running away from the officers with a gun in his

| | | |
|---|---|---|
| 02:36:10 | 1 | hand disobeying commands, and they shot him.  And the Fifth |
| 02:36:14 | 2 | Circuit said that is fine.  Qualified immunity applies. |
| 02:36:17 | 3 | And, again, I think the video evidence -- |
| 02:36:22 | 4 | Plaintiff didn't introduce any evidence, Judge.  You don't |
| 02:36:25 | 5 | have any evidence from him.  You don't have affidavits. |
| 02:36:27 | 6 | You don't have different videos.  You don't have anything. |
| 02:36:29 | 7 | You have our videos, you have the statements, and you have |
| 02:36:36 | 8 | deposition testimony and all are consistent. |
| 02:36:39 | 9 | And the relevant inquiry, again, it's not as to |
| 02:36:41 | 10 | subjective intent, right?  It's whether -- and the Garza |
| 02:36:47 | 11 | Court put it well.  The Fifth Circuit said in a similar |
| 02:36:49 | 12 | case in Garza, the question is whether Defendant's view |
| 02:36:52 | 13 | that Garza posed a threat of serious physical harm was |
| 02:36:56 | 14 | objectively reasonable. |
| 02:36:57 | 15 | And based on all those facts I read you, the |
| 02:36:59 | 16 | deposition testimony, the video, I would say it would be |
| 02:37:05 | 17 | hard-pressed to say it's not reasonable for somebody to be |
| 02:37:08 | 18 | afraid of somebody with a high-powered rifle in close |
| 02:37:12 | 19 | proximity to them when that person is angry, drunk, |
| 02:37:16 | 20 | intoxicated, uncooperative, and won't follow commands to |
| 02:37:20 | 21 | put the gun down.  They didn't just start firing.  And they |
| 02:37:20 | 22 | only fired one shot, and then they rendered medical aid. |
| 02:37:25 | 23 | And as I said, tragic, yes.  You had an officer |
| 02:37:29 | 24 | crying after the fact.  Nobody wanted this to happen. |
| 02:37:35 | 25 | Tragic, yes, but also lawful. |

02:37:37  1        And I believe that the Cole v. Carson case is

02:37:41  2   totally inapposite.  You've got questions of fact --

02:37:45  3   material fact that you don't have.  All you have here is

02:37:47  4   conjecture, conclusory statements, speculation as to what

02:37:52  5   Plaintiff could or could not have done, and all of that is

02:37:53  6   irrelevant.

02:37:54  7        The only thing the Supreme Court has said is

02:37:57  8   irrelevant is the facts and the totality of the

02:38:00  9   circumstances at the time that went into the officer's

02:38:04  10  belief that they had a reasonable probable cause to deem

02:38:07  11  this person a serious threat.

02:38:10  12       And I think in Garza, and I keep citing that case

02:38:15  13  because those two are directly on point.  The Fifth Circuit

02:38:18  14  wrote that Plaintiff's theories failed to provide adequate

02:38:22  15  deference to Defendant's snap judgment in the heat of a

02:38:28  16  perilous and rapidly evolving situation about the danger

02:38:32  17  Garza posed.  You could substitute Mr. Carico's name for

02:38:37  18  Garza, and it applies here.  Okay?  Plaintiff failed to

02:38:40  19  provide adequate deference to Defendant's snap judgment in

02:38:41  20  the heat of a perilous and rapidly evolving situation.

02:38:45  21       You know, Judge, I think in the case at hand,

02:38:49  22  again, there's no dispute of the relevant facts.  We went

02:38:53  23  through them in detail in the deposition.  Both officers

02:38:56  24  had cogent rationale for what they did and how they acted.

02:39:02  25  And I think all of these facts -- all of these support the

02:39:05  1  objectively reasonable belief that Mr. Carico posed a

02:39:09  2  danger.

02:39:09  3        You know, the Texas Rangers validated Officer

02:39:12  4  Bristow's action.  A Lamar County grand jury validated and

02:39:18  5  examined Officer Bristow's action.  And here we are yet

02:39:23  6  again, subject to the further review of this court.  So

02:39:27  7  tragic, absolutely.  But lawful, I would say absolutely.

02:39:30  8        And I think that this Court can rule on one or

02:39:34  9  both.  As the District Court did in Wilson with the man

02:39:37  10  running away with the gun who was shot and qualified

02:39:40  11  immunity was upheld, the District Court said both counts,

02:39:45  12  qualified immunity prevails.

02:39:47  13        First count, no constitutional violation.

02:39:50  14        Number two, there is no clearly established law

02:39:52  15  that would show he acted unreasonably in defiance of.

02:39:56  16        I would suggest that the same holds true in this

02:39:59  17  case, although, obviously, the Court need only go to one

02:40:02  18  prong if it desires.

02:40:04  19        But with that, Your Honor, I don't want to belabor

02:40:07  20  my time.  You've been very patient with me, and thank you

02:40:10  21  for putting up with my occasional rapid speech pattern.

02:40:14  22  That comes from having too many time limits usually set on

02:40:19  23  me in federal court, Judge.

02:40:21  24        THE COURT:  Thank you.

02:40:21  25        MR. NOGA:  And I'll answer any questions you may

02:40:23    1    have.

02:40:24    2            THE COURT:  No, that's all I have.  Thank you,

02:40:25    3    Mr. Noga.

02:40:26    4            MR. NOGA:  Thank you.

02:40:26    5            MR. MAGUIRE:  May I, Your Honor?

02:40:33    6            THE COURT:  Oh, yes.

02:40:34    7            MR. MAGUIRE:  I want to start by getting to the

02:40:36    8    point, and I think it's an issue that you started to

02:40:39    9    address in the beginning of Mr. Noga's address to the

02:40:43   10    Court.

02:40:44   11            The question is what case law clearly establishes

02:40:50   12    that the conduct of Officer Bristow was impermissible under

02:40:54   13    these circumstances?  That case has been identified.  It's

02:40:57   14    in the briefing.  And the proposition that Cole stands for

02:41:01   15    is that an officer is not entitled to qualified immunity

02:41:03   16    where an armed individual who has only threatened himself

02:41:10   17    and who has his back to an officer and is not given a

02:41:14   18    meaningful opportunity to respond to directions to drop the

02:41:18   19    weapon occurs.

02:41:20   20            Those are the factors that we have here.

02:41:24   21            THE COURT:  There was a bystander, though, in this

02:41:27   22    case where there was not in Cole; is that right?

02:41:30   23            MR. MAGUIRE:  Well, there were many officers in

02:41:34   24    the area in -- in the Cole case.

02:41:36   25            THE COURT:  Was there -- was there an officer or

02:41:38    1    any other person adjacent to the Plaintiff in that case as

02:41:46    2    there was in this case?

02:41:47    3         MR. MAGUIRE:  Adjacent to?  I don't think that the

02:41:53    4    facts described by the Court in Cole v. Carson, you know,

02:41:56    5    provide a diagram or a specific layout.  In that case, the

02:42:00    6    discharging -- there were officers following the young man.

02:42:04    7    It was a 17-year-old walking around the neighborhood with a

02:42:06    8    pistol at some points pointing it to his own head and --

02:42:11    9         THE COURT:  But do you know -- I mean, I'm just

02:42:14   10    looking for an answer.

02:42:15   11         Do you know, was there anyone near him when the

02:42:18   12    shooting occurred in the Cole case?

02:42:20   13         MR. MAGUIRE:  I would -- I would say from my

02:42:23   14    reading of the facts, there was no one in a similar

02:42:26   15    proximity as Ms. Reger was to Mr. Carico at the time.

02:42:31   16    Though, the facts don't go into depth about the specific

02:42:36   17    location of the officers that did not go with the

02:42:38   18    discharging officer and his partner.

02:42:43   19         Specific -- so the Court -- and I want to talk a

02:42:49   20    little bit about the facts in Cole v. Carson.  Again, this

02:42:55   21    was a 17-year-old young man.  The police were made aware he

02:42:59   22    was carrying a pistol around the neighborhood interacting

02:43:02   23    with many people.  In that case, the mere fact that he was

02:43:05   24    17 and carrying a pistol made him acting in the commission

02:43:09   25    of a crime.

| | | |
|---|---|---|
| 02:43:11 | 1 | There was no crime that these officers could have |
| 02:43:14 | 2 | arrested Mr. Carico for at the time that he had discharged, |
| 02:43:18 | 3 | unlike the young man who was carrying a pistol. |
| 02:43:21 | 4 | He went into the woods and was followed from some |
| 02:43:26 | 5 | distance from officers from one department, and there were |
| 02:43:30 | 6 | two officers from another department who, without being |
| 02:43:32 | 7 | directed to by the officers in charge, sort of covertly |
| 02:43:37 | 8 | went into the woods to take a different vantage point.  And |
| 02:43:41 | 9 | from there, they saw the young man step out of the woods |
| 02:43:44 | 10 | with the gun only to his head and him -- and them not |
| 02:43:48 | 11 | pointing towards the police officers. |
| 02:43:51 | 12 | There were various versions of what happened that |
| 02:44:02 | 13 | the Court had to contend with, but ultimately, what they |
| 02:44:05 | 14 | found was that the officers provided no warning that |
| 02:44:08 | 15 | granted Ryan sufficient time to respond and that Ryan was |
| 02:44:12 | 16 | not given an opportunity to disarm himself before he was |
| 02:44:15 | 17 | shot. |
| 02:44:16 | 18 | So I wanted -- we can see the video makes clear -- |
| 02:44:23 | 19 | it is undisputed in this case that Officer Bristow said, |
| 02:44:28 | 20 | drop your gun -- drop the gun before he discharged his |
| 02:44:32 | 21 | weapon. |
| 02:44:32 | 22 | The question and the video -- and the amount of |
| 02:44:35 | 23 | time between him saying that and the time that he fired, I |
| 02:44:38 | 24 | will defer to the portions of the second -- to the video, |
| 02:44:44 | 25 | but it's less than two seconds. |

02:44:47　1　　　　More importantly, Officer Bristow, before

02:44:49　2　discharging his firearm, concedes that he was not aware if

02:44:53　3　that order had been complied with.  He was not aware if

02:44:56　4　Mr. Carico had dropped the gun.  He simply -- he did not

02:45:02　5　see where the hand was, and he said it was entirely

02:45:05　6　possible that his -- that his order had been complied with.

02:45:09　7　　　　So as Cole v. Carson tells us -- the Court in Cole

02:45:15　8　v. Carson tells us, there has to be a meaningful

02:45:17　9　opportunity, a meaningful warning.  It's not sufficient to

02:45:22　10　just utter the word "drop the weapon," and then the officer

02:45:25　11　be entitled to shoot.

02:45:27　12　　　　In this case, that's precisely what may have

02:45:30　13　happened, and a jury should be given the opportunity to

02:45:31　14　determine if that is what happened.

02:45:33　15　　　　Certainly, when he was told to drop the gun,

02:45:36　16　Mr. Carico took steps to be in a less threatening position.

02:45:40　17　He turned his back to the officer.  So from the time he

02:45:43　18　said drop the gun, he's not sure if Carico drops the gun,

02:45:47　19　and Carico is now facing his back.

02:45:49　20　　　　That puts us in a very similar situation to what

02:45:53　21　we had in Cole where the Court said in a situation where an

02:45:56　22　individual has only threatened harm to himself, he has not

02:46:00　23　threatened harm to anyone else, and that individual is not

02:46:05　24　facing you and is, therefore, not an immediate threat with

02:46:09　25　the weapon at the time he's shot and is not given a

02:46:13  1  meaningful opportunity to drop the weapon, you are not

02:46:17  2  entitled to qualified immunity.

02:46:18  3        That's precisely where we find ourselves in this

02:46:21  4  case.  And, you know, it is --

02:46:23  5        THE COURT:  Can you cite me to the -- to the page

02:46:27  6  in Cole where the Court articulates --

02:46:27  7        MR. MAGUIRE:  Sure.

02:46:32  8        THE COURT:  -- the test as you're describing it?

02:46:33  9        I mean, I know that in the majority opinion in

02:46:37  10  Cole, they make several references to it being an obvious

02:46:40  11  case.

02:46:42  12        MR. MAGUIRE:  Sure.  This is on Page 4 -- 449,

02:47:06  13  Your Honor, and the paragraph actually begins on 448.  The

02:47:10  14  specific language I was discussing arrives in 449.

02:47:16  15        THE COURT:  Okay.  And where -- where

02:47:19  16  specifically -- I mean, I see the reference to not being

02:47:22  17  given an opportunity to disarm himself.

02:47:25  18        MR. MAGUIRE:  Sure.  So what a Court -- what

02:47:27  19  occurred next is disputed, given the summary judgment

02:47:30  20  evidence and drawing reasonable inferences and favorable --

02:47:35  21  in favor of the non-movant, the District Court determined

02:47:38  22  that a reasonable jury could find the following.  And one

02:47:42  23  of those -- it's No. 12 -- is that officers provided no

02:47:47  24  warning that granted Ryan a sufficient time to respond such

02:47:50  25  that Ryan was not given an opportunity to disarm himself

02:47:53  1   before he was shot.

02:47:54  2       THE COURT:  And so -- and so as you frame the

02:47:58  3   question here, it's whether or not the Defendants are

02:48:03  4   entitled to qualified immunity because they did not give

02:48:10  5   the Plaintiff an opportunity to disarm himself before he

02:48:14  6   was shot?

02:48:14  7       MR. MAGUIRE:  So in the peculiar structure of

02:48:20  8   qualified immunity where it is the obligation of the

02:48:24  9   responding party to direct the Court to the specific

02:48:28  10  authority that clearly establishes that a certain

02:48:33  11  circumstance does not permit the use of lethal force, we

02:48:37  12  find ourselves here in this very specific framework.

02:48:39  13      And I -- again, it's clear that under this

02:48:43  14  framework, as articulated by Cole, all of those things are

02:48:47  15  required or all of those things are a question for the jury

02:48:49  16  as to whether or not they were required.

02:48:51  17      Here --

02:48:53  18      THE COURT:  What do you mean as to whether or not

02:48:56  19  they were required?  What do you mean --

02:48:58  20      MR. MAGUIRE:  Oh, excuse me, as to whether or not

02:49:01  21  they were -- as to whether or not these factors were met by

02:49:05  22  the -- if these factors are met, it's a question that goes

02:49:10  23  to the jury.

02:49:10  24      THE COURT:  So the only factor that you've given

02:49:12  25  me, though, is that he wasn't giving -- given a meaningful

02:49:16   1   opportunity to disarm himself?

02:49:19   2        MR. MAGUIRE:  Well, also similar to the decedent

02:49:23   3   or to the injured party in Cole, he had never threatened

02:49:27   4   anyone but himself with violence.  He pointed the -- from

02:49:31   5   the moment the gun is introduced, he holds the gun to

02:49:37   6   himself, just as the young man in Cole v. Carson only held

02:49:40   7   the gun, that was clearly a factor that was taken into

02:49:42   8   consideration by the Court.  So, again, Mr. Carico never

02:49:49   9   threatened anyone but himself, just as the individual in

02:49:54   10  Cole v. Carson.

02:49:55   11       The other factor is that just as in -- the

02:50:03   12  individual in Cole, he was not facing the officer at the

02:50:06   13  time that he was shot.  The ballistics revealed that he was

02:50:12   14  only at a bladed angle, like 90 degrees, from the officer.

02:50:17   15       So, again, the young man at the time that he was

02:50:20   16  shot in Cole v. Carson was in an almost identical situation

02:50:25   17  as Mr. Carico.  He had only threatened himself.  He was not

02:50:29   18  facing the officer or pointing a gun at the officer at the

02:50:32   19  time he was shot, and he was not given a meaningful

02:50:37   20  opportunity to disarm himself prior to being shot.

02:50:40   21       And as qualified immunity cites go, this is on all

02:50:50   22  fours.  It's not exactly the same, but every single

02:50:52   23  relevant factor identified by the en banc court of the

02:50:57   24  Fifth Circuit is satisfied in this case.

02:50:58   25       THE COURT:  So would you describe the ways that

02:51:00    1    you think the cases are different?

02:51:02    2           MR. MAGUIRE:  Well, there are -- there are ways

02:51:06    3    that the case is different that benefit Mr. Carico.  One,

02:51:09    4    he's in his own home.  He's not a threat to the public.

02:51:12    5    He's not a threat to wander off.

02:51:17    6           Two, he was removing himself from the presence of

02:51:24    7    the officers into -- back into his own home at the time

02:51:29    8    that he was shot.

02:51:30    9           And, you know, Your Honor, you asked Defense

02:51:36    10   counsel about a representation that I made in my briefing,

02:51:42    11   and I want to quote it precisely, that Officer Bristow was

02:51:45    12   unable to identify any specific conduct that justified

02:51:50    13   to -- his decision to shoot Mr. Carico in the back, except

02:51:54    14   for that he was in possession of a gun.

02:51:56    15          Now, they gave a lot of speculation in response to

02:52:00    16   that, but I still didn't hear them talk about any specific

02:52:05    17   conduct, anything that Mr. Carico did.  Certainly, anything

02:52:09    18   could happen -- he could have gone inside and started doing

02:52:15    19   science experiments.  Anything could have happened.  But

02:52:18    20   that --

02:52:19    21          THE COURT:  But there -- but there -- but to be

02:52:21    22   fair, there were a number of things that were discussed

02:52:26    23   in -- in Officer Bristow's deposition about, you know,

02:52:33    24   concerns that he had possible risks, things that could have

02:52:37    25   happened.  Those -- those were things by his own testimony

02:52:40  1  that he considered in making this decision.

02:52:44  2        So help me understand why that doesn't matter in

02:52:49  3  your view.  And -- because I understand you've made that --

02:52:53  4        MR. MAGUIRE:  Understood.  And just to be clear,

02:52:55  5  the extensive recitation of Mr. -- or of Officer Bristow's

02:53:03  6  deposition was the rehabilitation portion of the

02:53:05  7  deposition.  Those questions were being asked --

02:53:07  8        THE COURT:  I understand.

02:53:08  9        MR. MAGUIRE:  -- and led by his own counsel.

02:53:11  10       The reason is -- an officer can arrive -- with all

02:53:14  11  due respect to police officers and occasional self-serving

02:53:19  12  statements that they make after they engage in conduct that

02:53:22  13  either doesn't comply with directives or the law, they can

02:53:23  14  say anything about what could happen.

02:53:25  15       Yes, you can speculate.  You could speculate that

02:53:29  16  if he had gone inside, he would have done any number of

02:53:32  17  things, but there was no conduct on the part of Mr. Carico

02:53:35  18  that would -- that would reasonably make you believe that

02:53:38  19  those things would happen.  He didn't -- he said what his

02:53:41  20  intent was, which was to harm himself.  He -- his conduct

02:53:47  21  and the manner that he handled the weapon was only

02:53:50  22  projected toward self-harm.  He never pointed it at anyone

02:53:53  23  else.  He never said, I'm going to kill you.  I'm going to

02:53:56  24  kill my girlfriend.  I'm going to go in and set the place

02:53:59  25  on fire.  You guys better watch your back, I'm going to

02:54:03    1    shoot through the walls of the house, or anything like

02:54:07    2    that.

02:54:07    3          So after the fact, they can come up with all of

02:54:08    4    these things that potentially could have happened.  It is

02:54:14    5    clear, naked speculation.  And, you know, the idea that if

02:54:19    6    he had run into the house, that he had weapons -- I mean,

02:54:23    7    almost -- I don't know the percentage of homes in -- in

02:54:26    8    this district that have guns inside of them, rifles in

02:54:33    9    particular, that, you know, could be used to shoot through

02:54:35    10   walls.  That doesn't make it reasonable speculation.  He

02:54:39    11   never indicated any desire to harm these officers.

02:54:43    12         So for them to just say, well, if he had gone back

02:54:46    13   into his home, where he was entitled to stay by their own

02:54:49    14   testimony -- they said if he didn't come out, we had to

02:54:53    15   just leave, and maybe we'd get a warrant, maybe we

02:54:56    16   wouldn't, but we had no legal authority to drag him out of

02:54:59    17   the house.  We had no legal authority to arrest him.

02:55:02    18         So if he comes out and then he's walking back in,

02:55:05    19   he's entitled to be there, and he's entitled to be in

02:55:07    20   possession of a rifle in his own home.  And for them to say

02:55:12    21   any number of things could have happened, it simply doesn't

02:55:15    22   justify the most powerful use that the Government grants

02:55:21    23   individuals to use against their fellow citizens, the use

02:55:25    24   of lethal force.  It has to be more than mere speculation

02:55:27    25   that something could have happened.  There's no fact --

02:55:28    1    there's no conduct, as I -- as I asked the officer, there

02:55:32    2    is no conduct that justified the decision to shoot.

02:55:35    3         THE COURT:  No.  And you used the words "specific

02:55:39    4    conduct."  Do you mean affirmative conduct, positive

02:55:43    5    conduct?

02:55:44    6         MR. MAGUIRE:  I mean conduct that was concrete

02:55:47    7    enough to justify on the balance of all things, all the

02:55:51    8    Graham factors, the fact that this was a low-level motor

02:55:57    9    vehicle accident investigation, the fact that they had no

02:56:01   10    knowledge of any criminal history, the fact that they had

02:56:04   11    no knowledge of any violence being involved in any of this,

02:56:07   12    the fact that they had no knowledge of him ever expressing

02:56:11   13    in his life any intent to harm his -- his significant

02:56:18   14    other.

02:56:18   15         All of those factors, when you look at them,

02:56:23   16    indicate that on balance, the decision to use lethal

02:56:28   17    force -- well, it's not justified, and it doesn't make a

02:56:34   18    reasonable, concrete, valid basis to use, again, the most

02:56:38   19    powerful use of governmental authority that we have.

02:56:41   20         So, again, Your Honor, all of these factors, all

02:56:55   21    of the Graham factors weigh in favor of Mr. Carico.  There

02:57:00   22    is authority that is clearly on point that an individual

02:57:05   23    who never threatens harm to anyone but themselves and has

02:57:09   24    their back to a police officer and is not been given a

02:57:14   25    meaningful opportunity to disarm themselves is not entitled

02:57:17   1   to qualified immunity.  That is the circumstance of this

02:57:21   2   case.

02:57:21   3          This is a -- I agree with counsel, this is an

02:57:25   4   extremely tragic circumstance.  My client is injured to the

02:57:30   5   extent that he will require aid for the rest of his life.

02:57:35   6   And a jury -- eight members of the Eastern District of

02:57:43   7   Texas should be given the opportunity to review that

02:57:46   8   videotape, to look at everything that happened, to be given

02:57:50   9   the law, and to -- and to make a decision as to whether or

02:57:56  10   not this was reasonable.

02:57:57  11          Clearly, they're not entitled to qualified

02:57:59  12   immunity.  And if the starting point of your inquiry on the

02:58:02  13   issue of reasonableness is an individual who was shot in

02:58:06  14   the back when the officer didn't even know if he was

02:58:08  15   holding a gun, that by -- is absolutely a question for a

02:58:11  16   jury to decide whether or not that officer was reasonable

02:58:15  17   to be in fear of imminent danger.

02:58:21  18          THE COURT:  And Cole is the best case you've got

02:58:23  19   for that proposition?

02:58:23  20          MR. MAGUIRE:  Cole is an en banc Fifth Circuit

02:58:26  21   case that is on point with all of the issues.  The only

02:58:28  22   distinction was in the -- well, short answer, yes, Your

02:58:32  23   Honor, that's the case we're relying on to establish that

02:58:35  24   they're not entitled to qualified immunity.

02:58:36  25          THE COURT:  The only distinction is what?

02:58:38  1         MR. MAGUIRE:  Well, the only distinction was there

02:58:41  2  were various questions about what was said and when it was

02:58:44  3  said.  The officers changed their story multiple times in

02:58:48  4  Cole.  The Court was -- was sorting out --

02:58:52  5         THE COURT:  That actually was a big issue in Cole,

02:58:55  6  was it not?

02:58:55  7         MR. MAGUIRE:  It was an issue, and in that -- in

02:58:59  8  that case, there was a question as to whether or not

02:59:03  9  either -- they found that a reasonable jury could find that

02:59:06  10 no warnings were given or that insufficient warnings,

02:59:10  11 meaning non-meaningful warnings were given.

02:59:15  12        THE COURT:  But the issue about the changing

02:59:17  13 stories, didn't the District Judge in that case make a

02:59:20  14 specific finding that the officers had changed their

02:59:23  15 stories multiple times?

02:59:25  16        MR. MAGUIRE:  Yes.  And that was -- you know, that

02:59:27  17 allowed them, in the Court's mind, to peer into the

02:59:30  18 credibility and give the jury an opportunity to --

02:59:33  19        THE COURT:  Right.  And I'm not saying it matters

02:59:35  20 here, but there's no evidence that occurred here, is there?

02:59:39  21        MR. MAGUIRE:  No, not -- nothing -- nothing like

02:59:42  22 what went on in Cole.  I mean, I think we could find

02:59:46  23 distinctions between the testimony and the

02:59:48  24 cross-examination of deposition versus the rehabilitation,

02:59:51  25 but certainly no accusation of the impropriety that went on

| | | |
|---|---|---|
| 02:59:56 | 1 | in Cole. |
| 02:59:57 | 2 | THE COURT:  Okay.  Couple of questions for you, |
| 03:00:01 | 3 | Mr. Maguire. |
| 03:00:01 | 4 | Is Cole -- is there anything other than Cole that |
| 03:00:05 | 5 | you think supports this idea about not -- you know, the |
| 03:00:13 | 6 | idea that the controlling law is one where you have to give |
| 03:00:21 | 7 | someone a meaningful opportunity to respond to directions |
| 03:00:25 | 8 | to drop the weapon?  Is there anything other than Cole from |
| 03:00:29 | 9 | the Fifth Circuit or elsewhere that you think support -- |
| 03:00:32 | 10 | MR. MAGUIRE:  Well, I think the Supreme Court |
| 03:00:33 | 11 | identified the importance of notice prior to the use of |
| 03:00:39 | 12 | lethal force going back to Graham v. Connor. |
| 03:00:42 | 13 | THE COURT:  Back to what? |
| 03:00:43 | 14 | MR. MAGUIRE:  Graham v. Connor.  I mean, that's -- |
| 03:00:47 | 15 | that's where the principle comes from, and every time that |
| 03:00:49 | 16 | issue is analyzed it's because it's been, you know, |
| 03:00:52 | 17 | clear -- Graham is still clear precedent. |
| 03:00:54 | 18 | THE COURT:  You made -- make a reference to |
| 03:00:56 | 19 | Graham -- I think you referred to the Graham factors in |
| 03:01:00 | 20 | your argument.  Graham is not in your brief. |
| 03:01:02 | 21 | Can you summarize what the Graham factors are? |
| 03:01:06 | 22 | MR. MAGUIRE:  I believe -- so the -- it is in my |
| 03:01:47 | 23 | brief, Your Honor. |
| 03:01:47 | 24 | THE COURT:  Oh, I'm sorry. |
| 03:01:48 | 25 | MR. MAGUIRE:  That's okay, respectfully. |

| | | |
|---|---|---|
| 03:01:50 | 1 | And it's on Page 6 of 10.  That's with the -- I |
| 03:01:54 | 2 | apologize for not having bottom numbers. |
| 03:01:56 | 3 | THE COURT:  Oh, that's all right. |
| 03:01:57 | 4 | MR. MAGUIRE:  But it's Page 6 of 10. |
| 03:02:03 | 5 | THE COURT:  All right.  Okay.  I see.  My |
| 03:02:05 | 6 | apologies.  I see what you're talking about. |
| 03:02:08 | 7 | MR. MAGUIRE:  Okay. |
| 03:02:16 | 8 | THE COURT:  I do want to ask you another couple of |
| 03:02:18 | 9 | questions. |
| 03:02:19 | 10 | MR. MAGUIRE:  Yes, sir.  Yes, Your Honor.  Sorry. |
| 03:02:21 | 11 | THE COURT:  There's a cite at the end of your |
| 03:02:33 | 12 | brief, the last page -- Page 9 of 10, there's a reference |
| 03:02:44 | 13 | to a Tennessee versus Garner case.  And that, too, is a |
| 03:02:55 | 14 | Supreme Court case.  And you say Tennessee versus Garner |
| 03:03:01 | 15 | announced the principle that where the suspect poses no |
| 03:03:04 | 16 | immediate threat to the officer and no threat to others, |
| 03:03:08 | 17 | the harm resulting from failing to apprehend him does not |
| 03:03:13 | 18 | justify the use of deadly force to do so. |
| 03:03:18 | 19 | What were the circumstances in that case, do you |
| 03:03:20 | 20 | know? |
| 03:03:21 | 21 | MR. MAGUIRE:  That was the -- |
| 03:03:22 | 22 | THE COURT:  Was it a -- |
| 03:03:24 | 23 | MR. MAGUIRE:  It was a fleeing from a -- it was an |
| 03:03:27 | 24 | individual fleeing, I think, initially by vehicle. |
| 03:03:32 | 25 | THE COURT:  Different facts altogether. |

03:03:33    1          MR. MAGUIRE:  Yes, altogether.

03:03:35    2          THE COURT:  Okay.  Okay.  What -- there's no

03:03:44    3    dispute here, is there, that the Plaintiff was intoxicated?

03:03:54    4          MR. MAGUIRE:  I don't know if that has been -- I

03:04:00    5    don't -- that is not a matter of record, Your Honor.  I

03:04:02    6    would -- I would defer Your Honor to --

03:04:05    7          THE COURT:  Well, let me ask it this way.  Do you

03:04:07    8    dispute the allegation that he was intoxicated?

03:04:12    9          MR. MAGUIRE:  Candidly, Your Honor, I don't -- I

03:04:17    10   don't feel comfortable answering that question without -- I

03:04:19    11   mean, that is a question, if we get past this stage, if he

03:04:23    12   is deposed, that he can certainly be -- that he could

03:04:27    13   certainly respond to, but at this time, I would -- I would

03:04:29    14   respectfully request that the Court rely upon the record

03:04:33    15   before him.

03:04:37    16         THE COURT:  Okay.  Tell me what the factual

03:04:38    17   dispute is here.  So this is a summary judgment issue.

03:04:45    18   The affidavits of the two officers, as well as excerpts of

03:04:53    19   the deposition of Officer Bristow, as well as the two body

03:05:00    20   cam footage sections are all attached to the motion.  You

03:05:06    21   responded to that motion, and I don't know that there's

03:05:11    22   anything --

03:05:12    23         MR. MAGUIRE:  There's not, Your Honor.  The

03:05:14    24   entirety of --

03:05:15    25         THE COURT:  Is there a factual dispute here?

| | | |
|---|---|---|
| 03:05:17 | 1 | MR. MAGUIRE:  No.  It's on video, Your Honor. |
| 03:05:20 | 2 | THE COURT:  Yeah. |
| 03:05:20 | 3 | MR. MAGUIRE:  I mean, it -- you know, there's -- |
| 03:05:21 | 4 | there's -- it's one of the great things for -- for both |
| 03:05:26 | 5 | citizens and police.  We're all held accountable and held |
| 03:05:31 | 6 | under the light of truth to what's on video.  What happened |
| 03:05:35 | 7 | on that video is what happened. |
| 03:05:36 | 8 | Officer Bristow responds to that video and says: |
| 03:05:38 | 9 | Yes, I shot him in the back, but I'm entitled to qualified |
| 03:05:45 | 10 | immunity. |
| 03:05:45 | 11 | Our response is:  No, you're not.  See Cole v. |
| 03:05:48 | 12 | Carson. |
| 03:05:48 | 13 | THE COURT:  Yeah, so I guess what I'm struggling |
| 03:05:50 | 14 | with is you say in your brief that there's a factual |
| 03:05:52 | 15 | dispute here, and so I'm trying to understand -- |
| 03:05:53 | 16 | MR. MAGUIRE:  If there's a -- there's a dispute |
| 03:05:54 | 17 | under the law whether or not they're entitled to |
| 03:05:56 | 18 | qualified -- |
| 03:05:56 | 19 | THE COURT:  So there's not a factual dispute? |
| 03:05:59 | 20 | MR. MAGUIRE:  I don't -- again, there are -- the |
| 03:06:04 | 21 | statements of the officers that can -- that they would |
| 03:06:08 | 22 | characterize as truthful and I would characterize as |
| 03:06:11 | 23 | self-serving require a jury to make credibility |
| 03:06:16 | 24 | determinations.  That doesn't -- those aren't -- that -- |
| 03:06:23 | 25 | those aren't the facts in the sense of what occurred.  They |

03:06:26  1    are facts meaning they are statements within the record of

03:06:29  2    the case that may be put before a jury.

03:06:32  3              THE COURT:  Okay.  Give me one second.

03:06:39  4              MR. MAGUIRE:  Yes, sir.  Yes, Your Honor.

03:06:40  5              THE COURT:  You mentioned the fact that no warning

03:06:53  6    was given here.  There was a -- there were instructions,

03:06:56  7    according to the Defendant, to drop the weapon but -- but

03:07:01  8    no warning.

03:07:01  9              What's the difference between what was said and

03:07:06  10   your view of what a warning would have been required?

03:07:09  11             MR. MAGUIRE:  Well, a warning would be:  You're

03:07:12  12   going to get shot.  Drop the gun.  You're --

03:07:14  13             THE COURT:  If you don't drop the gun, I will

03:07:16  14   shoot you?

03:07:17  15             MR. MAGUIRE:  Stop or I'll -- stop or I'll shoot.

03:07:20  16   Drop it or I'll shoot.  You're going to get shot.

03:07:23  17             I mean, these are things we hear --

03:07:24  18             THE COURT:  To be distinguished from the mere

03:07:27  19   statement:  Drop the weapon?

03:07:28  20             MR. MAGUIRE:  Drop the weapon.  Certainly the

03:07:30  21   officers would testify that the implication there is the

03:07:33  22   remainder of the sentence that we just gave.  Drop the

03:07:36  23   weapon or we will shoot.

03:07:39  24             Again, the question that's going to get to the

03:07:41  25   jury here, Your Honor, is whether or not their actions

03:07:47   1   qualifies as a meaningful opportunity to comply with the

03:07:52   2   directives in order to fall within the factors of Cole v.

03:07:57   3   Carson.

03:07:57   4        A jury could certainly see an importance in that

03:08:02   5   distinction.  But they -- the law -- you know, since Graham

03:08:08   6   v. -- going -- going back to the '80s has been where

03:08:12   7   feasible, a warning should be provided.  They did not

03:08:14   8   provide that warning.

03:08:16   9        THE COURT:  Right.  And so Mr. Noga tells us that

03:08:19  10   the law doesn't require it.

03:08:21  11        So is it the -- is it the limitation where

03:08:25  12   feasible or when feasible that makes it --

03:08:32  13        MR. MAGUIRE:  Sure.  And, again, I think it should

03:08:34  14   be a question for the jury in this case, whether it was

03:08:37  15   feasible to give that particular type of warning.  I

03:08:40  16   don't -- I mean, the Court does not give a specific set of

03:08:44  17   words.  And that's why we have juries, to make a

03:08:48  18   determination whether or not they have complied with the

03:08:52  19   spirit of the law dictated by the Supreme Court, which is

03:08:55  20   that where feasible, a warning must be given.

03:08:59  21        I have no doubt that he would argue before a jury

03:09:02  22   that it was not feasible to do so because of the rapidly

03:09:05  23   escalating circumstances.  I think that's something that a

03:09:08  24   jury should decide for themselves.

03:09:10  25        THE COURT:  Okay.  And that's because you think

03:09:15    1    there are credibility determinations that need to be made

03:09:17    2    on the basis of the witness's testimony?

03:09:19    3           MR. MAGUIRE:  I think that the citizens should be

03:09:21    4    able to look at -- should be informed of the law by

03:09:26    5    Your Honor as to what the requirements were.  I'm sure that

03:09:28    6    would be after a very detailed charge conference, but one

03:09:32    7    of those factors that may end up before them is whether or

03:09:36    8    not they complied with the Fourth Amendment requirement to

03:09:39    9    provide a warning where feasible, and perhaps a specific

03:09:43   10    question may be presented to them.

03:09:44   11           I doubt it would -- I have very little experience

03:09:49   12    where that specific question has ended up in a verdict

03:09:51   13    sheet, but certainly that factor can be incorporated into a

03:09:55   14    charge and a question on a verdict sheet when they're

03:09:58   15    making the determination as to the big question of whether

03:10:01   16    or not the conduct and the use of force was reasonable.

03:10:05   17           THE COURT:  Okay.  Thank you, Mr. Maguire.

03:10:07   18           MR. MAGUIRE:  Thank you, Your Honor.

03:10:10   19           MR. NOGA:  May I respond, Your Honor?

03:10:15   20           THE COURT:  Yes.

03:10:16   21           MR. NOGA:  Thank you.

03:10:16   22           Your Honor, I will try to be brief and speak

03:10:19   23    slower, but a couple points.

03:10:22   24           The legal requirement -- the legal issue is not

03:10:25   25    whether he was given a meaningful opportunity to respond.

| | |
|---|---|
| 03:10:30 | 1 |
| 03:10:34 | 2 |
| 03:10:37 | 3 |
| 03:10:41 | 4 |
| 03:10:44 | 5 |
| 03:10:48 | 6 |
| 03:10:51 | 7 |
| 03:10:55 | 8 |
| 03:10:59 | 9 |
| 03:11:03 | 10 |
| 03:11:07 | 11 |
| 03:11:12 | 12 |
| 03:11:17 | 13 |
| 03:11:19 | 14 |
| 03:11:20 | 15 |
| 03:11:24 | 16 |
| 03:11:27 | 17 |
| 03:11:30 | 18 |
| 03:11:35 | 19 |
| 03:11:38 | 20 |
| 03:11:39 | 21 |
| 03:11:42 | 22 |
| 03:11:45 | 23 |
| 03:11:50 | 24 |
| 03:11:53 | 25 |

As a factual matter, and as the video shows, he was told to drop the weapon.  He did not do so.  He was told by multiple officers to do it.  He had time to turn around and go back in his house or try to get back in his house.  If he had time to do that, he had time to put the rifle down. He didn't do that.  But that's not the legal issue.

The legal issue is not -- the reason we have qualified immunity is so a jury doesn't do 20/20 hindsight from the comfort of a courtroom on life and death situations when officers are put in danger.  That's why the issue is are the officers' actions based on an objectively reasonable belief?  That's -- the issue or what the jury can decide -- I mean, that's the whole point.  We can anticipate it.

Everybody tries to take that route in a qualified immunity case.  Oh, let's see if we can convince some strangers that, hey, what happened years ago in a yard with a drunk, angry person brandishing a firearm in your face, okay, let's see if that's an issue.  It's not the legal issue.

On Cole v. Carson, I'm just going to say that Plaintiff's brief on Page 9, his response says:  While this case may not be directly on point -- referring to Cole -- because there's a question as to whether the decedent Cole was explicitly aware of the police presence -- well,

03:11:57    1    there's more than that.  It is not precisely on point.

03:12:00    2         Those cases that I cited to you, Judge, as the

03:12:04    3    prevailing law in the Fifth Circuit that I quoted saying

03:12:06    4    that we don't -- he doesn't have to be given a warning, he

03:12:10    5    doesn't have to point the gun, those were decided after

03:12:13    6    Cole v. Carson.

03:12:14    7         Cole v. Carson was based on disputed facts that

03:12:18    8    bear no resemblance to this case.  Not only did you have

03:12:23    9    the conflict over whether the officers had changed their

03:12:27   10    testimony, and that Cole v. Carson had gone up to the

03:12:30   11    Supreme Court.  It had been up and down on the Fifth

03:12:33   12    Circuit multiple times.  It went to the U.S. Supreme Court.

03:12:36   13    That was sent back down, and the U.S. Supreme Court told

03:12:40   14    them comply with Mullenix.  Apply the facts with

03:12:43   15    particularity.  And then you finally had an en banc

03:12:46   16    hearing, and you have six dissents.

03:12:48   17         THE COURT:  Did it go back to the District Court

03:12:51   18    before it went to the Fifth Circuit?

03:12:51   19         MR. NOGA:  Yes, I believe so, Judge.

03:12:52   20         THE COURT:  After the Supreme Court?

03:12:53   21         MR. NOGA:  I believe -- I think it went to the

03:12:55   22    Fifth Circuit, then it went back down to the District, and

03:12:56   23    then it came back up.

03:12:57   24         And it's funny, Judge, there were so many

03:13:00   25    permutations on this, there were so many opinions on Cole

03:13:03    1  v. Carson before it went en banc, but you have a materially

03:13:06    2  different situation.

03:13:07    3        Number one, you did not have the bystander

03:13:10    4  standing nearby Kayla.  And we're talking about facts.

03:13:14    5  What was a fact?  Well, a fact was that she told the police

03:13:18    6  officer, Bristow, that she thought Carico was angry with

03:13:21    7  her, okay?  That's a fact.

03:13:22    8        Number two, she was in proximity.  And both

03:13:25    9  officers testified she was within his line of fire.  He

03:13:27   10  could have swung on her easily.  And they were concerned

03:13:30   11  about her as well as themselves.  You did not have that

03:13:33   12  situation.

03:13:34   13        You also have a situation in Cole v. Carson, and

03:13:37   14  I'm familiar with the case, he walked out of bushes, and

03:13:40   15  there was a question of fact as to whether he was even

03:13:43   16  aware of police presence.

03:13:45   17        So that was part of the factor, too.  And the

03:13:49   18  cases I read you, Judge, you look at Wilson v. Bastrop, you

03:13:57   19  look at Garza versus Briones.  Both were decided after Cole

03:14:03   20  by the same Fifth Circuit.  And in it, it says:  We have

03:14:05   21  never required officers to wait until a Defendant turns

03:14:08   22  toward them with weapon in hand before applying deadly

03:14:10   23  force to ensure their safety.  Plaintiffs identify no basis

03:14:14   24  for second-guessing an officer's split-second judgment.  We

03:14:19   25  reject Plaintiff's argument that Johnson posed no threat

| | |
|---|---|
| 03:14:22 | 1 |
| 03:14:25 | 2 |
| 03:14:28 | 3 |
| 03:14:32 | 4 |
| 03:14:32 | 5 |
| 03:14:33 | 6 |
| 03:14:37 | 7 |
| 03:14:38 | 8 |
| 03:14:40 | 9 |
| 03:14:45 | 10 |
| 03:14:48 | 11 |
| 03:14:50 | 12 |
| 03:14:53 | 13 |
| 03:14:56 | 14 |
| 03:15:04 | 15 |
| 03:15:08 | 16 |
| 03:15:10 | 17 |
| 03:15:11 | 18 |
| 03:15:14 | 19 |
| 03:15:17 | 20 |
| 03:15:20 | 21 |
| 03:15:23 | 22 |
| 03:15:26 | 23 |
| 03:15:29 | 24 |
| 03:15:31 | 25 |

1  because he never actually aimed his gun at an officer.

2      Okay?  They said the issue is the reasonableness

3  of the belief of the officer that he posed a serious

4  threat.

5      THE COURT:  Is this the Wilson case --

6      MR. NOGA:  Yes, Judge.

7      THE COURT:  -- that cite?

8      MR. NOGA:  Yeah, if you look at Footnote 3.

9  Footnote 3 in that case amplifies what they talked about in

10  the text.  Wilson, that was decided in 2022.  That's a

11  post -- post-Cole decision.  And like -- Plaintiff is

12  honest, he says Cole is not directly on point.  It's not.

13  You could not have Wilson.  You could not have Garza.  You

14  could not have Bazan ex rel./Hidalgo County, which we also

15  cite, you could not have those cases if the law was as

16  Plaintiff said it was.  And these are post-Cole, the same

17  Fifth Circuit.

18      So the issue is not whether he had a meaningful

19  opportunity to respond.  The issue is what the officer

20  perceived under the totality of the circumstances.  You

21  talk about conduct.  Plaintiff is trying -- Plaintiff's

22  attorney says:  Well, there's no specific conduct.  It's

23  all speculation.  It's not speculation.

24      Here's -- here's conduct.  Introducing a rifle

25  into the scene.

| | |
|---|---|
| 03:15:33 | 1 |
| 03:15:37 | 2 |
| 03:15:37 | 3 |
| 03:15:39 | 4 |
| 03:15:40 | 5 |
| 03:15:42 | 6 |
| 03:15:46 | 7 |
| 03:15:46 | 8 |
| 03:15:49 | 9 |
| 03:15:51 | 10 |
| 03:15:55 | 11 |
| 03:15:58 | 12 |
| 03:16:03 | 13 |
| 03:16:06 | 14 |
| 03:16:08 | 15 |
| 03:16:14 | 16 |
| 03:16:16 | 17 |
| 03:16:19 | 18 |
| 03:16:23 | 19 |
| 03:16:24 | 20 |
| 03:16:31 | 21 |
| 03:16:34 | 22 |
| 03:16:38 | 23 |
| 03:16:42 | 24 |
| 03:16:47 | 25 |

1    Here's conduct.  Refusing to put it down when told
2  to.
3    Here's conduct.  Having your finger on the
4  trigger.
5    Here's conduct.  Turning towards -- away from the
6  officer going toward his house and turning toward Officer
7  McCraw.
8    Here's conduct.  Telling his girlfriend he's angry
9  at her.
10    Okay?  And it's not -- the specific conduct,
11  there's no case out there in the Fifth Circuit.  And I've
12  20 something years argued these cases for cities and law
13  enforcement.  I can't find a case that says, well, it's not
14  important what the officer thinks.  You have to have
15  specific action.  Every case is the contrary.  It's what is
16  the officer's reasonable perception based on the
17  circumstances known to him.  What does he see?  What does
18  he know?  It's not just the actions of the suspect.
19  There's no case that says that.
20    And, you know, the no meaningful opportunity to
21  respond, as I said, when you look at the video, he had
22  time -- if he had time to turn around and ignore the
23  officers and go into the house, he had time to put the gun
24  down.  And there is no case -- no case -- even Plaintiff's
25  response, he puts in the Garner section saying:  Well, you

03:16:50   1   should have a warning before deadly force is used where

03:16:55   2   feasible.  That's not a fact question for the jury, okay?

03:16:59   3   There's no legal requirement.  We are looking at officer's

03:17:02   4   conduct in this case based on clearly established law.

03:17:05   5   There is no clearly established law that says you can't

03:17:07   6   shoot at a person with a gun unless he -- unless you give

03:17:10   7   him this specific warning.

03:17:12   8        THE COURT:  So let me ask you, is -- and I'm not

03:17:16   9   trying to be cute here.  Is your -- is your quarrel with

03:17:23  10   Mr. Maguire's argument that the controlling authority

03:17:29  11   requires the denial of your motion for qualified immunity

03:17:34  12   because the officer did not give the Plaintiff a meaningful

03:17:38  13   opportunity to respond to directions to drop the weapon?

03:17:43  14   Is it because you don't think the law requires that or

03:17:46  15   because you believe on the facts here the officer did give

03:17:50  16   him that opportunity?

03:17:51  17        MR. NOGA:  I will -- both.  I don't believe that

03:17:55  18   the law requires that a specific warning be given.  On the

03:17:59  19   facts given, when somebody's -- when an officer points a

03:18:03  20   gun at you and tells you to drop your weapon, I think the

03:18:05  21   implication that he can use that gun that he's taken out of

03:18:08  22   his holster is pretty clear.  And I don't see -- there is

03:18:11  23   no case that requires a specific warning.

03:18:15  24        In the -- in the -- the Cole case, as we said, the

03:18:18  25   issue was whether he even was aware of a police presence.

| | | |
|---|---|---|
| 03:18:22 | 1 | Here there was no doubt there was a police presence. |
| 03:18:24 | 2 | And the other thing about Cole, as I said, you did |
| 03:18:27 | 3 | not have the bystander issue present, you didn't have the |
| 03:18:29 | 4 | complicating factors they were dealing with, with his |
| 03:18:33 | 5 | girlfriend in the yard.  And -- |
| 03:18:34 | 6 | THE COURT:  Can I ask you? |
| 03:18:36 | 7 | MR. NOGA:  Yes, sir. |
| 03:18:36 | 8 | THE COURT:  Is the -- I mean, on the Cole case, |
| 03:18:39 | 9 | are you familiar -- how can I -- where can I find in the |
| 03:18:44 | 10 | record in Cole that there was not the bystander issue that |
| 03:18:48 | 11 | we have here? |
| 03:18:49 | 12 | MR. NOGA:  Well, Judge, I got to be honest with |
| 03:18:54 | 13 | you, I have written papers on this.  There's so many |
| 03:18:58 | 14 | opinions in Cole, I'm not quite sure -- I remember the |
| 03:19:02 | 15 | facts.  I don't remember there ever being an issue raised, |
| 03:19:06 | 16 | a disputed question of fact.  The officer -- the question |
| 03:19:10 | 17 | was, as I recall in Cole, did he shoot before giving any |
| 03:19:17 | 18 | warning, okay?  There was a question -- well, besides the |
| 03:19:19 | 19 | fact that the lower Court had said they changed their |
| 03:19:22 | 20 | testimony and the stories were -- |
| 03:19:22 | 21 | THE COURT:  Right.  I'm asking about who was |
| 03:19:24 | 22 | closest to the -- to Cole? |
| 03:19:26 | 23 | MR. NOGA:  Well, he stepped out of some bushes, |
| 03:19:30 | 24 | and there were officers searching for him in the woods. |
| 03:19:33 | 25 | THE COURT:  And I think it was -- the reference |

| | |
|---|---|
| 03:19:35 | 1 |
| 03:19:36 | 2 |
| 03:19:40 | 3 |
| 03:19:43 | 4 |
| 03:19:48 | 5 |
| 03:19:52 | 6 |
| 03:19:56 | 7 |
| 03:19:58 | 8 |
| 03:19:59 | 9 |
| 03:20:03 | 10 |
| 03:20:08 | 11 |
| 03:20:12 | 12 |
| 03:20:15 | 13 |
| 03:20:18 | 14 |
| 03:20:19 | 15 |
| 03:20:22 | 16 |
| 03:20:26 | 17 |
| 03:20:30 | 18 |
| 03:20:32 | 19 |
| 03:20:35 | 20 |
| 03:20:39 | 21 |
| 03:20:41 | 22 |
| 03:20:43 | 23 |
| 03:20:45 | 24 |
| 03:20:48 | 25 |

1  was 10 to 20 feet away?

2       MR. NOGA:  I believe so.  I don't -- but, again, I

3  don't know if that was the reason the shot was fired

4  because the issue in Cole that the majority appeared to

5  focus on was whether there was even any kind of warning

6  given.  A, was he aware of a police presence; B, did they

7  say anything before they shot?  And I think that was part

8  of the problem with inconsistent testimony.

9       But as I pointed out, Judge, you could not have

10  Briones, you could not have Wilson v. Bastrop if Cole was

11  the way you say or whether my opposing counsel says it is,

12  you couldn't have that because you've got --

13       THE COURT:  Because they would conflict with Cole?

14       MR. NOGA:  Totally.  You've got -- when Johnson

15  ran armed and disobeyed Green's commands to drop the gun,

16  his use of deadly force became justified.  And because the

17  legal focus -- again, you know, all the cases in the Fifth

18  Circuit say this is quite factually intensive, all these

19  excessive force cases, that's why they have  particularized

20  to the facts.  But that's why we went through some length

21  through the deposition testimony.  And it doesn't matter

22  where it comes from.  It's not rebutted.

23       You asked properly whether there are any disputed

24  factual questions.  There are not.  Plaintiff did not

25  introduce anything undercutting the testimony of the

| | | |
|---|---|---|
| 03:20:51 | 1 | officers.  The officers testified to tell their story |
| 03:20:55 | 2 | under -- under oath.  They gave it.  There's nothing before |
| 03:20:58 | 3 | you that undercuts that.  Their testimony is consistent. |
| 03:21:01 | 4 | It fits the video, and the video is conclusive.  And ever |
| 03:21:05 | 5 | since the Supreme Court case in Scott v. Harris, we know |
| 03:21:08 | 6 | that if there's any arguments of counsel, you look at the |
| 03:21:11 | 7 | video, and then you look and see what the witness said to |
| 03:21:15 | 8 | corroborate that video. |
| 03:21:16 | 9 | There's no dispute of fact.  It's clear what |
| 03:21:19 | 10 | happened.  But the problem is, is that for Plaintiff to |
| 03:21:22 | 11 | prevail, he's got to try to shift the legal focus from what |
| 03:21:25 | 12 | was in the minds of the officers that created the |
| 03:21:29 | 13 | indication that they thought there was an immediate threat |
| 03:21:32 | 14 | to the safety of themselves or others, and was that belief |
| 03:21:36 | 15 | reasonable? |
| 03:21:36 | 16 | Plaintiff has very little -- Plaintiff's |
| 03:21:40 | 17 | motivations have nothing to do with that.  And when -- you |
| 03:21:46 | 18 | know, it's not meaningful warning.  That's not an issue in |
| 03:21:49 | 19 | qualified immunity.  It's not required.  It's not a legal |
| 03:21:52 | 20 | issue.  It's not a factual issue.  It's not relevant to the |
| 03:21:55 | 21 | qualified immunity inquiry. |
| 03:21:56 | 22 | You know, and you asked about the facts in |
| 03:21:58 | 23 | Tennessee v. Garner.  I'm familiar with those facts.  That |
| 03:22:02 | 24 | was a case where a guy was running away from an officer, a |
| 03:22:05 | 25 | suspect.  He wasn't armed.  The officer shot him, and the |

03:22:09    1    officer admitted he didn't think he was armed.

03:22:12    2         So there was no threat at all.  This isn't a

03:22:15    3    case -- we've got a guy with a rifle here, a high-powered

03:22:19    4    308.  In Garner, you've got a person running away who was

03:22:24    5    unarmed, and the officer said he didn't think he was armed,

03:22:28    6    and then he shot him.

03:22:28    7         Now -- and in terms of -- I do want to correct one

03:22:33    8    quick misstatement too.  Officer Bristow testified when he

03:22:37    9    was asked by opposing counsel if you believe Mr. Carico had

03:22:39   10    committed a crime, he goes:  Yeah, possibly.  He left the

03:22:43   11    scene of the accident, possibly DUI.

03:22:46   12         And you asked about any evidence about the

03:22:47   13    intoxication.  That's not rebutted.  The perceptions of the

03:22:51   14    officers, again, on the statements and in the deposition

03:22:55   15    said they observed facts.  They observed slurred speech.

03:23:01   16    Bristow said I could hardly tell what he -- understand what

03:23:03   17    he was saying at first.  Glassy eyes, slurred speech,

03:23:08   18    erratic reactions.  Both officers said they thought he was

03:23:10   19    intoxicated.  Plus, he's coming from an accident scene

03:23:12   20    where a truck was rolled over, and it's Mr. Carico's truck,

03:23:16   21    okay, which he was looking at.

03:23:18   22         So he testified in his deposition, yeah, I could

03:23:21   23    have been looking at a crime.  But you asked about the

03:23:23   24    Graham factors, and the Graham factors really don't come

03:23:27   25    into play in terms of calculating -- that's a whole

03:23:31    1    different analysis.

03:23:32    2         The relevancy is not, well, we're not looking

03:23:35    3    at -- are we arresting him for a particular crime?  No.

03:23:38    4    This is a totality of circumstances, excessive force case

03:23:43    5    where the reasoning, the calculation, what you have to look

03:23:46    6    at, according to the law, is was the force used reasonable

03:23:51    7    under the circumstances, right?  And the circumstances are

03:23:55    8    the objective reasonableness of the belief of the officer

03:24:00    9    and whether they had reason to believe he posed a threat.

03:24:04   10    And that's why it's a question of law.

03:24:06   11         I understand why opposing counsel wants to make it

03:24:09   12    a question of fact, but the reasonableness is measured at

03:24:12   13    the time of the incident.  And it's measured from the

03:24:16   14    standpoint of what the officers knew or believed.  And it

03:24:19   15    doesn't even have to be true.  It's like those cases you

03:24:22   16    had where the shiny object the officer thought was a knife.

03:24:26   17    It wasn't.

03:24:26   18         It's like the Briones case or the Garza case I

03:24:30   19    read where they thought it was a gun, but it was a BB gun.

03:24:33   20    It doesn't even have to be true in that sense.  It has to

03:24:37   21    be what the officers reasonably believed and whether that

03:24:41   22    was objectively reasonable to their mind to constitute a

03:24:46   23    threat.

03:24:46   24         And that really -- you know, the argument hasn't

03:24:50   25    changed on that.  I mean, I'm looking at the other notes,

03:24:53  1    if you'll bear with me a minute, Judge, from what

03:24:57  2    Mr. Maguire testified to.

03:24:59  3         Again, none of the testimony of the officers was

03:25:03  4    contradicted.  The video is -- is clear.  He just keeps

03:25:09  5    saying, well, they shouldn't have used so much force.  But

03:25:11  6    that's not the test, and it's not for the jury to second

03:25:14  7    guess.  That's, again, why we have qualified immunity.

03:25:17  8         And the issue is when you look at the

03:25:20  9    circumstances and you look at the video and you look at the

03:25:23  10   factors that were articulated and it's not just

03:25:27  11   impressions, it's conduct, it's actions, it's observations

03:25:30  12   of the officers, when you look at that, did they have a

03:25:34  13   reasonable belief that they, Kayla Reger, or perhaps

03:25:40  14   somebody in the house that they didn't know was there or

03:25:42  15   not were in danger?  Or did they have a reasonable belief

03:25:46  16   that this angry intoxicated person might take a potshot at

03:25:52  17   them through the window or from the house?  Did they have a

03:25:55  18   reasonable belief that it was wrong to let this guy run

03:25:57  19   around with a rifle in his hand in his condition and that

03:26:01  20   by doing so, he posed a danger to themselves (sic) and

03:26:03  21   others?  Was that objectively reasonable?  That's a

03:26:07  22   question of law, and that's what we're asking the Court to

03:26:12  23   consider.

03:26:12  24        Thank you, Judge.

03:26:13  25        THE COURT:  Thank you, Mr. Noga.

03:26:14    1          Mr. Maguire, could I ask you to address the

03:26:17    2    Salazar case?  I meant to do that.  I don't think you

03:26:21    3    addressed that.  Salazar is the case that's cited in Cole

03:26:25    4    that refers to this idea about -- I'll just -- I'll just

03:26:32    5    read you -- I can cite you to the --

03:26:34    6          MR. MAGUIRE:  Is this the case -- the crowd where

03:26:36    7    the guy exits a vehicle?

03:26:38    8          THE COURT:  It's the -- it's the case -- I can

03:26:42    9    cite you to the -- in the Cole case, it's on Page 461.  And

03:26:50   10    what it says is citing Salazar, which is 826 F.3d 272, a

03:26:58   11    Fifth Circuit case from 2016.

03:27:01   12          They say:  This Court added, furthermore, in the

03:27:05   13    context of this case, it is immaterial whether Salazar

03:27:09   14    turned left, right, or at all before being shot.

03:27:13   15    Specifically, we've never required officers to wait until a

03:27:18   16    Defendant turns toward them with weapon in hand before

03:27:21   17    applying deadly force to ensure their safety.

03:27:26   18          MR. MAGUIRE:  May I?

03:27:27   19          THE COURT:  Yes, please.

03:27:27   20          MR. MAGUIRE:  And, Your Honor, I thank you for

03:27:30   21    this question.  It gives me an opportunity to address

03:27:33   22    Wilson, which counsel has referred to multiple times.

03:27:38   23          I think we've been sort of ignoring something very

03:27:43   24    obvious or we haven't had enough discussion about the

03:27:47   25    obviousness.  Mr. Carico -- excuse me, Your Honor -- like

03:27:51  1   the individual in Cole v. Carson, had never threatened

03:27:57  2   anyone and specifically threatened themselves.  There's a

03:28:00  3   question of whether or not they were suicidal.

03:28:04  4        And also, there's no dispute that his -- his back

03:28:09  5   was directly to the -- the officer at the time was shot.

03:28:15  6        So the -- the Plaintiff in Wilson -- one, this all

03:28:23  7   started -- police got involved because he and someone else

03:28:28  8   were brandishing weapons, and I think they -- they drew on

03:28:31  9   each other.  So there was a threat to the community, and

03:28:33  10  they were a threat to each other, and that's how the police

03:28:36  11  first got involved.

03:28:37  12       The officer then pulled the individual over.  He

03:28:42  13  hopped out with the pistol in his hand and an extended

03:28:47  14  clip, and he's running through the neighborhood, and he's

03:28:49  15  running to a school, and he eventually shoots at him, and

03:28:53  16  then the officer who ultimately kills him heard those shots

03:28:56  17  and then fired again.

03:28:57  18       So there's all these factors that have -- that are

03:29:00  19  nothing to -- and he, you know, plucks cleverly from this,

03:29:06  20  this freestanding proposition that, you know, an officer

03:29:08  21  can shoot and kill even if the -- even if the gun is never

03:29:12  22  raised in their direction.

03:29:13  23       Well, this was a person -- these are totally

03:29:16  24  different facts.  And this is someone running around as a

03:29:19  25  threat to the community and shots had already been fired.

03:29:23  1          And more importantly, I want to remind the Court,

03:29:28  2   he never -- he never threatened -- he never threatened

03:29:32  3   himself with harm.  All of his actions were directed

03:29:35  4   outwardly.

03:29:36  5          All of Mr. Carico's actions were directed towards

03:29:38  6   himself.  That's what makes Cole unique, and that's why

03:29:42  7   it's clearly established as to Officer Bristow's use of

03:29:47  8   force because he found these specific factors that -- that

03:29:52  9   Mr. Carico, like the -- like the young man in Cole, only

03:29:56  10  threatened himself.  And Mr. Carico, like the young man in

03:30:00  11  Cole, was not facing anywhere towards the officer at the

03:30:03  12  time that the discharge occurred.

03:30:05  13         So to compare -- to say that the holding in Wilson

03:30:12  14  could not stand because of the -- or if Cole didn't stand

03:30:17  15  for the proposition that I assert to the Court it does is

03:30:20  16  totally unrealistic.

03:30:22  17         And, Your Honor -- I'm sorry, could you -- I had

03:30:27  18  difficulty tracking --

03:30:27  19         THE COURT:  The Salazar case.

03:30:28  20         MR. MAGUIRE:  Yeah, I had difficulty, Your Honor,

03:30:30  21  finding in the --

03:30:32  22         THE COURT:  Oh, okay.  Page 467 of -- of Cole,

03:30:47  23  about midway down.  I mean, that cites Salazar, which is,

03:30:57  24  you know, only a seven-year old case now.

03:31:00  25         MR. MAGUIRE:  Sure.

03:31:00    1          THE COURT:  We have never required officers to

03:31:02    2    wait until a Defendant turns toward them with weapon in

03:31:06    3    hand --

03:31:07    4          MR. MAGUIRE:  Sure.  And, Your Honor, I would love

03:31:09    5    to be given the opportunity to further brief after this

03:31:11    6    hearing why Salazar is dissimilar.  I'm going to take a

03:31:14    7    guess for you right here.  That's not a case about a guy

03:31:17    8    who only put a gun to his own head, and that's not a guy

03:31:20    9    who got shot in the center of his back.  I don't know those

03:31:23   10    facts, but I'd like to be given the opportunity to draw

03:31:27   11    those distinctions.

03:31:28   12          THE COURT:  Well, I mean, it's in -- it's in the

03:31:30   13    case that you cite as your best case.

03:31:33   14          MR. MAGUIRE:  Understood.  And there are hundreds

03:31:35   15    of cites within there, and I -- the Court's point is well

03:31:40   16    taken.  But for this specific case, we have to look at the

03:31:49   17    really critical -- those two factors are extremely critical

03:31:53   18    here, right?  That's -- that's why we're bringing this

03:31:57   19    challenge.  That's why we're saying they don't have

03:31:59   20    qualified immunity.

03:31:59   21          If the facts were different than they were, I

03:32:02   22    would have sought out a different case to tell Your Honor

03:32:06   23    why it was clearly established that -- or I wouldn't have

03:32:10   24    taken the case, or I would have found something that said

03:32:16   25    it's -- why it's not clearly established that the officers

03:32:16    1    can't act in the way they did in this case.

03:32:18    2          THE COURT:  Okay.  Well, let me suggest this,

03:32:20    3    Mr. Maguire.  Why don't -- why don't -- what is today, the

03:32:24    4    13th?  Let me give you seven days to supplement with some

03:32:29    5    description of Salazar.  That would be helpful.

03:32:32    6          MR. MAGUIRE:  I appreciate it.  And I'll limit it

03:32:34    7    to Your Honor's question.

03:32:36    8          THE COURT:  Mr. Noga, seven days after that to

03:32:38    9    file some sort of a response.

03:32:40   10          MR. NOGA:  Thank you, Your Honor.

03:32:40   11          THE COURT:  Is that fair?

03:32:41   12          MR. NOGA:  That's fair, Your Honor.

03:32:43   13          THE COURT:  Okay.  Anything else from either side?

03:32:44   14          MR. MAGUIRE:  No, Your Honor.  Thank you for your

03:32:46   15    time and attention.

03:32:47   16          THE COURT:  Thanks very much.  This is a

03:32:50   17    difficult, tragic case.  I -- you know, I've spent a lot of

03:32:55   18    time on it already, I will tell you, and I want to get it

03:33:00   19    right.

03:33:02   20          So, Mr. Maguire, if you'll, you know, provide some

03:33:06   21    supplemental authority.

03:33:10   22          And, Mr. Noga, if you want to respond to that,

03:33:13   23    that would be helpful.

03:33:14   24          Obviously, depending on how I rule on this issue,

03:33:17   25    if -- if I deny it, that, of course, is appealable on an

| | |
|---|---|
| 03:33:24 | 1 |
| 03:33:28 | 2 |
| 03:33:34 | 3 |
| 03:33:44 | 4 |
| 03:33:47 | 5 |
| 03:33:48 | 6 |
| 03:33:51 | 7 |
| 03:33:52 | 8 |
| 03:33:53 | 9 |
| 03:33:56 | 10 |

1    interlocutory basis.  If I grant it, obviously it becomes

2    finally appealable.  And whichever way I determine is the

3    correct outcome, you know, I think, you know, either side

4    should strongly consider taking it up to make sure I've

5    gotten it right.

6             MR. MAGUIRE:  I appreciate that, Your Honor.

7             MR. NOGA:  Thank you, Your Honor.

8             THE COURT:  Appreciate you very much.

9             Thanks -- thanks to all of you for being here.

10            COURT SECURITY OFFICER:  All rise.

11            (Hearing concluded at 3:34 p.m.)

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /S/ Shelly Holmes                    9/18/2024
     SHELLY HOLMES, CSR, TCRR             Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25